**Michael V. GEAGAN et al.**

v.

**John A. GAVIN, Superintendent, Massachusetts Correctional Institution.**

**Civil No. 60–4.**

United States District Court
D. Massachusetts.

Jan. 27, 1960.

Paul T. Smith and Manuel Katz, Boston, Mass., for McGinnis, Costa & Pino.

Lawrence O'Donnell, Dorchester, Mass., for Richardson, Faherty & Geagan.

Robert DeGiacomo, Boston, Mass., for Maffie.

Henry Sontag, Boston, Mass., for Baker.

John F. McAuliffe and George F. Hurley, Sp. Asst. Attys. Gen., Boston, Mass., for defendant.

WYZANSKI, District Judge.

January 18, 1960 eight persons, now serving sentences in the Massachusetts Correctional Institution at Walpole, filed in this Court a petition for a writ of habeas corpus.

. The petition states that on October 6, 1956 the eight "were found guilty in the Superior Court for Suffolk County,

Massachusetts, of various offenses arising out of the $1,219,000 so-called Brinks robbery". It recites the sentences imposed, and the commitments to Walpole. Then petitioners claim that the sentences are "in violation of the Fourteenth Amendment to the Constitution of the United States, as hereinafter set forth."

The gist of the alleged violation of the Fourteenth Amendment may fairly be summarized as follows: first, that the publicity issued or stimulated by federal and state enforcement officials and other massive, sustained publicity prejudiced the grand jury; second, that the publicity issued or stimulated by such officials made it impossible for petitioners to obtain a fair trial at any time during the period within which they might have obtained a constitutionally speedy trial; third, that the publicity issued or stimulated by such officials and other massive, sustained publicity prejudiced the petit jury; and fourth, that the trial judge denied the petitioners the opportunity to offer evidence to sustain the foregoing allegations.

Then the petition recites that petitioners have exhausted their remedies available in the courts of Massachusetts by appealing from the Superior Court to the Supreme Judicial Court, which on July 1, 1959 affirmed the judgment of the Superior Court in accordance with an opinion entitled Commonwealth v. Geagan, Mass., 159 N.E.2d 870; and by seasonably petitioning the United States Supreme Court for a writ of certiorari, which petition was on November 16, 1959 denied by that court. 361 U.S. 895, 80 S.Ct. 200, 4 L.Ed.2d 152.

The petition ends with the usual prayers.

This Court forthwith issued to the respondent an order to show cause, pursuant to 28 U.S.C. § 2243.

January 21 respondent filed his return. January 25 petitioners filed a traverse. On the same day this Court held a hearing for the express purpose of determining whether a plenary hearing was necessary and if not whether the petition should be granted or denied.

The first question is whether this Court has jurisdiction to entertain this petition. A lower court must answer with due deference to the interpretation which Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 and Irvin v. Dowd, 1959, 359 U.S. 394, 79 S.Ct. 825, 3 L.Ed.2d 900 have given to 28 U.S.C. § 2241(c) (3). But see Note by Henry M. Hart, 73 Harv.L.Rev. 84, 103–121 (1959).

In the Act of February 5, 1867, 14 Stat. 385, now incorporated in 28 U.S.C. § 2241(c) (3), Congress conferred upon United States District Judges authority to entertain a petition for habeas corpus from a state prisoner "in custody in violation of the Constitution * * * of the United States." In the light of the existing case law, the 1867 Congress should have foreseen and undoubtedly did foresee that this would authorize a United States District Judge to make a twofold inquiry whether there was a state court judgment which purported to authorize the custody and whether the state court which entered that judgment had jurisdictional competence, that is "authority to make decisions" of the kind involved in the judgment. See Hart & Wechsler, The Federal Courts and The Federal System, (1953), p. 1238 note 48.

But Congress did not use language, and there was nothing in the avowed purpose or legislative history of the 1867 statute, which compelled the Supreme Court of the United States to interpret the statute as conferring upon United States District Judges authority to inquire whether a state court judgment by a jurisdictionally competent court rested upon any procedural step or substantive ruling involving a violation of the United States Constitution.

Brown v. Allen, however, took the long step of concluding that the 1867 statute should be given such a broad construction that the United States District Judges should have jurisdiction to make this further inquiry in a case where the state prisoner had first exhausted all his remedies in the state

courts and had unsuccessfully sought review of the state court determination by a petition for certiorari in the Supreme Court of the United States.

Undoubtedly there were plausible reasons for the doctrine of Brown v. Allen. The Supreme Court recognized that if procedural and substantive federal constitutional questions with respect to state cases could be reviewed only upon the often skimpy state records and often uninformative petitions for certiorari of state court records filed in the Supreme Court of the United States those federal constitutional questions would frequently receive inadequate attention. See Brown v. Allen, 344 U.S. at pages 494–495, 73 S.Ct. at page 440. To expand the role of federal district judges in habeas corpus cases made it possible for the Supreme Court to treat such district judges virtually as its delegates or masters to make such findings and rulings as were necessary, all subject to ultimate review by federal courts of appeal and the Supreme Court of the United States. Perhaps the Supreme Court also felt that despite the state court judges' oath to support the United States Constitution, their awareness of the Supremacy Clause of the United States Constitution, art. 6, cl. 2, and their generally high professional ability, state court judges were not so likely as inferior federal judges to uncover all the facts, summarize them sympathetically to the federal claim, and analyze them consistently with developing trends in the Supreme Court of the United States. In some ways this last consideration resembles the policy which led Congress to authorize the removal to the federal courts of certain federal constitutional cases begun in the state courts. Cf. 28 U.S.C. § 1441(b) and 28 U.S.C. § 1443.

Yet we must recognize that the Brown v. Allen expansion of habeas corpus jurisdiction involves risks which should not be increased. To give the state prisoner the right to file in the United States District Court a petition for habeas corpus to test *any* alleged procedural or substantive federal constitutional error in the course of the state trial implies that in addition to having his federal constitutional claim considered by a state trial court, a state appellate court, and justices of the Supreme Court of the United States scrutinizing his petition for certiorari of the state court record, he may have that claim considered by a United States District Court, a United States Court of Appeals, and justices of the Supreme Court of the United States scrutinizing his petition for certiorari of the federal appellate court record. Also, when a procedural or substantive constitutional question may be raised by a petition for habeas corpus, the question may be raised long after the petitioner has been sentenced, and thus may deliver from jail persons against whom the requisite evidence for a second trial is no longer available. Perhaps up to now the expansion of the writ of habeas corpus has not caused an unbearable delay in criminal justice, an intolerable burden upon the judicial system, or a widespread jail delivery. But if the Supreme Court of the United States continues to expand the concept of due process of law as applied to state criminal proceedings the consequences may be serious. What is involved is not merely an increase in the substantive part which federal law plays in local criminal jurisprudence but also an increase in the procedural role which individual federal district judges play in local criminal law enforcement.

The reason that this Court has restated the considerations favoring and opposing the doctrine of Brown v. Allen is to put in its appropriate setting the present case in which, as will later appear, petitioners are relying upon alleged federal constitutional claims some of which have not the slightest support in cases of the Supreme Court of the United States, and none of which is firmly supported by a final disposition by that court.

█ Accepting Brown v. Allen and Irvin v. Dowd as binding authorities, this Court now turns to their application in this case. Those authorities make it

clear that to have his petition entertained a state prisoner must show that he has a federal constitutional claim and he must further show that he has exhausted available state court remedies.

In the instant case Geagan and the other petitioners have clearly exhausted their state court remedies. They seasonably prosecuted an appeal to the highest state tribunal, as required by Daniels v. Allen, decided sub nom. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, and seasonably filed in the Supreme Court of the United States a petition for certiorari seeking review of the state court judgment, as required by Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 and Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761.

■ Also petitioners allege colorable federal constitutional claims in two parts of their petition—sections VIII and IX. Section VIII alleges that Massachusetts violated petitioners' federal constitutional right to a fair and impartial trial because state and federal enforcement officers acting collectively stimulated massive publicity which was calculated to convince the petit jury of petitioners' guilt and which did convince the petit jury of petitioners' guilt. Section IX of the petition alleges that Massachusetts violated petitioners' federal constitutional right to a fair and impartial trial in that massive publicity (not alleged in this section to have been due to official complicity) convinced the petit jury of petitioners' guilt. All the opinions delivered last year by the Supreme Court in Irvin v. Dowd assume that it is not frivolous for a defendant in a state criminal trial to claim that it violates the due process clause of the Fourteenth Amendment to the United States Constitution to subject him to trial by a petit jury which has been prejudiced by massive publicity stimulated by prosecuting officials. And it may be that the due process clause would be violated in some cases where the petit jury was subjected to massive publicity which had not been stimulated by the prosecution.

Cf. Moore v. Dempsey, 261 U.S. 86, 91, 43 S.Ct. 265, 67 L.Ed. 543.

But there are other parts of the petition for a writ of habeas corpus which assert federal constitutional claims which this Court does not regard as sufficiently colorable to come within this Court's jurisdiction.

■ Sections V and VI assert that Massachusetts violated petitioners' federal constitutional right to a fair and impartial *grand* jury by allowing the grand jury to be affected by massive publicity part of which was caused by state officials. Underlying these sections is the assumption that, in a state which purports to try a defendant for an infamous crime only after he has been indicted by a grand jury, it is a denial of the due process clause of the Fourteenth Amendment for that state grand jury to be influenced in returning an indictment by massive publicity, especially if such publicity is stimulated by state officials. The assumption is unsupported by any case in the Supreme Court of the United States. And the assumption is untenable. If all that a defendant can show is that the grand jury which accused him (not the petit jury which tried him), was prejudiced by publicity, he has not been denied any federal right; or if he has been denied a federal right that denial is not a ground for releasing him from custody pursuant to a sentence imposed after a verdict of an unprejudiced petit jury.

■ The federal constitution does not require that a state use a grand jury. Hurtado v. People of State of California, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232. Whether a charge be presented by a grand jury or by a district attorney, it is only a charge. It merely puts the accused to trial. It is not evidence. No reasonable person would suppose that the imprisonment of a defendant convicted by an unbiased state petit jury is in violation of the United States Constitution merely because the charge considered by that petit jury was a criminial information drawn by a dis-

trict attorney who responded to massive publicity. And it seems to me equally clear that the imprisonment of a defendant convicted by an unbiased state petit jury is not in violation of the United States Constitution merely because the charge considered by that petit jury was an indictment returned by a grand jury which responded to massive publicity inspired by the district attorney. After all, historically grand juries were entitled to act upon the knowledge they individually had acquired before they sat as jurors. And even today grand jurors act ordinarily only upon evidence and arguments they get from the prosecution which is not always free from partisanship.

In short, this Court agrees with the opinion of Chief Justice Wilkins that there are no such federal constitutional rights as sections V and VI of the petition for habeas corpus allege. See Commonwealth v. Geagan, 159 N.E.2d at page 880. Hence paragraphs V and VI must be dismissed on the ground that they do not allege a ground for writ of habeas corpus within the jurisdiction conferred on this Court by 28 U.S.C. § 2241(c) (3). See Brown v. Allen, 344 U.S. 443, 502, 73 S.Ct. 397, 97 L.Ed. 469 first full paragraph.

■ Section VII of the petition for habeas corpus asserts that "Massachusetts violated petitioners' federal constitutional right to a fair, impartial and at the same time speedy trial" in that "the impact of * * * prejudicial, pretrial publicity continued for so long a period of time that it became impossible for petitioners to obtain a fair trial at any time during the period within which they might have obtained a constitutionally speedy trial." It is to be observed that this section purports to allege something different from sections VIII and IX of the petition. The contention apparently is that if petitioners are not to be held under their present sentences because such sentences were a consequence of a trial which violated their federal constitutional rights, the petitioners can no longer be held in custody awaiting re-trial. The thesis seems to be that if the trial were to be held now it would not be so speedy a trial as it is asserted the United States Constitution requires under the "due process clause". Or perhaps the contention is that if the trial were to be held now a petit jury would still be infected by the massive publicity, and therefore the petitioners must be released because they cannot be put to trial because of the fault of the prosecution. This Court concludes that this part of the petition is premature. Unless the petitioners are entitled to have relief from the sentences under which they are now serving, no question can arise as to whether in the event of such relief it would be a violation of the United States Constitution to subject them to fresh trials on the same indictments or to hold them awaiting a time when the effects of previous publicity have been dissipated.

The foregoing analysis reveals that the only substantive question which this Court need now consider is whether petitioners were denied due process of law in having been tried by a petit jury which it is claimed was prejudiced by massive publicity, some of this it is said was stimulated by state prosecuting officials.

■ Merely because this Court now has jurisdiction to entertain some parts of this petition it does not follow that this Court must hold a plenary hearing on those parts of the petition. Mr. Justice Reed's opinion, particularly at pages 463–465 of 344 U.S., at pages 410–412 of 73 S.Ct., and Mr. Justice Frankfurter's opinion, particularly at pages 503–508, of 344 U.S., at pages 444–447 of 73 S.Ct., in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, point out what are the relevant criteria. It is with these criteria in mind that the following five paragraphs are written.

This Court already has before it the voluminous record of the proceedings in the state court, as well as the briefs which were before the Supreme Court of the United States and which conveni-

ently point to the relevant parts of that record.

In the state courts petitioners had the same experienced counsel they now have. Using almost precisely the words they now use, counsel urged both before the state trial court and the state Supreme Judicial Court that due to massive publicity stimulated in part by state and federal officials the petit jury was biased, the grand jury was biased, and a trial both speedy and fair was impossible.

Moreover, the trial judge and the appellate court assumed *arguendo* that every fact now alleged or sought to be proved by the prisoners was indeed true. That is, the Massachusetts courts proceeded on the assumption that the present petitioners could prove that there was massive publicity, that it involved the pre-trial disclosure of details of the alleged relation of the petitioners to the crime charged, the way the crime was committed, and the history, activities, and prior criminal records of the present petitioners, and that this massive publicity received some stimulus from releases of information by federal officials and state prosecutors acting cooperatively. By making these assumptions *arguendo* the state courts gave the petitioners the full equivalent of an opportunity to prove the facts they then alleged and now allege.

Addressing themselves specifically to the alleged facts, including the assumed facts as well as the proven facts, both the Superior Court and the Supreme Judicial Court rejected the petitioners' contentions. The rulings of Superior Court Justice Forte show an accurate and complete comprehension of the facts (both assumed and proven), the legal contentions, and the constitutional principles. Chief Justice Wilkins's opinion is a model of clarity in its exposition of the record in the state court, of the issues presented, and of the governing authorities. There is no reason to believe that any court, certainly not this one, would improve on that opinion, or give a more complete account of the facts and ques-

tions presented, or offer a sounder constitutional analysis.

Inasmuch as petitioners offer no evidence which goes beyond what the state courts heard or assumed *arguendo,* it is unnecessary for this Court to conduct a plenary hearing on the present petition. It would involve merely "a repetition of the trial" and a "burdensome and useless repetition of effort." Brown v. Allen, 344 U.S. 443, 504, 73 S.Ct. 397, 445, 97 L.Ed. 469.

■ It remains my duty to form an independent judgment on "the application of constitutional principles to the facts as found" (Id., 344 U.S. at page 507, 73 S.Ct. at page 446) and assumed by the state courts. On the application of such principles I am required to form my own opinion, but I am not required "to shut" my "eyes to the State consideration of such issues." Id., 344 U.S. at pages 507–508, 73 S.Ct. at page 446.

From the record in the state court, from the facts assumed both by Superior Court Justice Forte and by the Massachusetts Supreme Judicial Court, from the findings of fact by those courts, and from the evidence proffered in this Court, there can be no reasonable doubt as to what is the maximum showing of fact which petitioners can make.

In the light most favorable to the petitioners the evidence might show that public officials, including state prosecutors, released for publication detailed accounts of how they believed the Brinks crime was perpetrated, of how the crime was solved, what role each of petitioners had in the crime, what the prosecution supposed the petitioners had done to arrange alibis and to conceal their part in the crime, what prior criminal records each petitioner had, and what other persons who ultimately were not called at the trial had said or done. Various media of publicity used this and other information to print extensive and continuous accounts in the press. The intensive coverage of this publicity was responsive to a widespread interest in what has been called the largest armed rob-

bery in history and to the long-continued investigation and extraordinary detective skill said to have been required to uncover the alleged perpetrators.

There is no basis for suggesting that any public official or indeed that any medium of communication sought to arouse, or did use communications reasonably susceptible of arousing, passion, intense emotion, or hysteria. The trial took place in an orderly fashion in one of the largest metropolitan areas in this country, where a venire reflects far less unity of background, association, reading and listening habits, and emotion than in a rural community. Moreover, the crime itself was not the sort that excites men's passions and distorts their judgment as much as it stirs their amazement on account of its boldness and magnitude, intrigues their interest because of its conspiratorial character and ramifications with underworld activities, and creates doubt as to the efficacy of existing safeguards of property. It cannot justly be said that the publicity here created anything like the "irresistible wave of public passion" revealed by the record in Moore v. Dempsey, 261 U.S. 86, 91, 43 S.Ct. 265, 266, 67 L.Ed. 543, and suggested by the record in Irvin v. Dowd.

Furthermore, in the facts proved and assumed there is no ground for inferring that in the Brinks case the state prosecutors used publicity as a means of drawing to the attention of prospective jurors either statements which the prosecutors knew to be false (Cf. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791) or coerced confessions, or illegally seized evidence, or other matter which might be excluded at a trial on the precise ground that its introduction would violate the federal constitutional rights of one or more of the present petitioners.

Thus the worst that might be provable by petitioners against the prosecutors is that they participated in releasing for conspicuous and continuous publication evidence which they did introduce against the petitioners, and other evidence which they did not introduce and could not introduce over objection at the trial. Included in this latter category were the criminal records of the petitioners.

There are grave risks inherent in pre-trial publication of detailed evidence (which may or may not be offered in court) of the commission of a crime, of defendant's alleged participation, of defendant's prior criminal record, and of other material which tends to lead persons to form at least a tentative judgment before they hear in court the evidence and the governing law. Such pre-trial publicity makes it more difficult to be sure that defendant has the benefit of the presumption of innocence and the guarantee of confrontation of the witnesses against him. In some countries such publicity is punished criminally as a contempt of court. In this country if such publicity is stimulated by public authorities, a federal court, in the exercise of its general power to supervise the administration of criminal justice in its own judicial system, may postpone a trial, or even set aside a judgment of conviction if a defendant's motion for continuance is denied and despite that motion a trial is held forthwith before the effects of pre-trial publicity have abated. Delaney v. United States, 1 Cir., 199 F.2d 107.

But the problem for this Court is whether a state jury trial conducted in the face of publicity of the type assumed to have been present in the Brink's case and assumed to have been stimulated by the prosecutor was a violation of the due process clause of the Fourteenth Amendment warranting a federal court in relieving a state prisoner from a state court judgment. Cf. Stroble v. State of California, 343 U.S. 181, 191–195, 72 S.Ct. 599, 96 L.Ed. 872. In deciding this problem a federal court must be mindful that the traditional safeguards against the risk of prejudicial publicity, even publicity stimulated by the prosecution, are a postponement of the trial at defendant's request, a change of venue at defendant's request, and a careful examination of persons called for jury duty

to eliminate any prejudiced person. Thus in Irvin v. Dowd the precise issue was whether it was a denial of due process not to grant defendant either his motion for a change of venue or his motion for a continuance. No judicial decision known to this Court has suggested that under the Fourteenth Amendment to the United States Constitution it is necessary to have permanent immunization of defendant from trial in a situation where the prosecution has stimulated excessive publicity.

■ Nor does the fact that pre-trial publicity has been massive and sustained and is traceable to the prosecution furnish a sound reason for creating immunity from trial as a new type of safeguard, as distinguished from giving generous latitude to traditional safeguards, and enforcing the denial of such safeguards by disregarding a judgment rendered in a trial where those safeguards were denied. Undoubtedly excessive publicity justifies and may require a longer postponement of the trial upon defendant's request, or a change of venue upon defendant's request, or a more than perfunctory voir dire examination of potential jurors. But it goes beyond a guarantee of due process to the defendant to rule that he can never be tried because a public official by stimulating publicity hindered a speedy trial. Admittedly such a rule would deter officially-inspired publicity. But such a rule of immunity is not usually necessary to give the particular defendant whose right was abused by publicity a fair safeguard. For him the fair safeguards are ordinarily a motion to postpone the trial, a motion for change of venue, and a careful voir dire scrutiny of each juror as he is called. Ordinarily it is only after it is satisfied that *one* of those safeguards has been denied that a federal court should consider whether a petitioner is entitled to be relieved of a state judgment on the ground of prejudice caused by publicity.

Mindful of the usual safeguards the experienced trial judge in the Brinks case, Mr. Justice Forte, not being presented with either a motion for change of venue or a motion for continuance invited defendants' counsel to file a motion for continuance if they desired delay, but counsel made no such motion. The trial judge set the date of trial for August 6, 1956. And in selecting that date he, in the opinion of the Supreme Judicial Court, did not commit an abuse of discretion. Commonwealth v. Geagan, Mass., 159 N.E.2d 870, 881.

Moreover, when the time for trial arrived the judge spent many weeks in examining on the voir dire, in accordance with ancient and approved Massachusetts statutory practice, the venire of jurors. Examples of his thoroughness are set forth in the opinion of the Massachusetts Supreme Judicial Court. Chief Justice Wilkins correctly noted that in 1500 pages of the typewritten transcript there is "revealed a patient and careful succession of examinations by the trial judge." Commonwealth v. Geagan, Mass., 159 N.E.2d 870, 882.

■ This Court has independently concluded that petitioners, not having chosen to move for a continuance, or a change of venue, had their rights fully preserved by the voir dire examination. This Court does not regard the voir dire as defective on the ground that in accordance with the dignified, expeditious, and fair practice of the Commonwealth, only the trial judge put questions. Nor does this Court regard the actual questions put by Judge Forte as inadequate. They covered not only the grounds specified by Mass.G.L.(Ter.Ed.) c. 234 § 28 but also other points. They were calculated to discover whether a juror was free from prejudice caused by pre-trial publicity. These questions satisfied the Massachusetts Supreme Judicial Court and they satisfy the demands of the due process clause.

This Court having noted that petitioners deliberately on advice of counsel failed to move for a continuance or to move for a change of venue, and had the benefit of a fairly conducted voir dire examination of the jury which tried them, this Court concludes they have not prov-

ed that they are held in custody in violation of their rights under the due process clause of the Fourteenth Amendment to the United States Constitution.

In reaching this conclusion this Court has not overlooked petitioners' argument that the due process clause gives a criminal defendant the right to both an unprejudiced trial and a speedy trial, and that, therefore, a court should not lay down a rule that unless a defendant has unsuccessfully moved for continuance he does not make a valid federal constitutional claim that his right to an unprejudiced trial has been violated by pretrial publicity. The first reason for rejecting the argument is that under this Court's formulation of the rule a defendant may make a colorable federal constitutional claim if he was unfairly denied a motion for a change of venue, or if he was denied a fair voir dire examination of jurors, or if he was unfairly denied a motion for continuance. Any one of the three denials is sufficient as a condition precedent. The second reason for rejecting the argument is that it is an unwarranted extension of Delaney v. United States, 1 Cir., 199 F.2d 107. That case held that a defendant had a standing to claim that he had suffered prejudice from a trial infected by publicity although he had declined to move for a change of venue. Venue is a fixed conception, and a defendant cannot be required, as a condition of complaining of prejudiced atmosphere, to surrender his right to be tried in the federal district where the crime is alleged to have been committed. A speedy trial is a flexible conception dependent on a variety of factors. More important, in the Delaney case no constitutional question was involved. If we are to read into the due process clause an inhibition against a state trying a defendant while there remains in the atmosphere the effect of officially inspired publicity, it is fair to subject defendant to a trial at a later date unless defendant shows that the effect outlasts the flexible and reasonable time span available for a speedy trial. After one or more continuances have been granted, a defendant may be able to show that while a further delay would still be necessary to avoid the effect of pre-trial publicity such delay would carry the date beyond the time limit appropriate for a speedy trial, or, for example, he may show that necessary witnesses for his defense have died during a delay caused by the prosecution's publicity. But until he has made at least one motion for a continuance a defendant could hardly persuade a reasonable court that pre-trial publicity, no matter how massive and sustained, would poison the atmosphere beyond the time when it would still be possible to have a trial which the Constitution would regard as sufficiently speedy.

Petition denied.