COMMONWEALTH *vs.* THOMAS A. GUERRO
(and three companion cases [1]).

Worcester.  May 4, 1970. — June 19, 1970.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & QUIRICO, JJ.

*Receiving Stolen Goods. Motor Vehicle*, Receiving stolen motor vehicle,
Operation, Master key. *Conspiracy. Statute*, Retroactive statute.
*Practice, Criminal*, Severance, Examination of jurors, Voir dire, Pro-
duction of document. *Search and Seizure.*

With respect to a motor vehicle in the possession of a person without
the authority of the owner, convictions of the possessor both upon an
indictment under G. L. c. 266, § 28, for operating that vehicle after
his right to operate had been suspended and upon an indictment under
§ 28 for receiving that vehicle knowing it to have been stolen were
not precluded on the ground that the indictments "were either in-
consistent or the receiving was a lesser offense included in the [of-
fense of] operating without authority." [749–750]

Evidence at a trial warranted conviction of four defendants upon indict-
ments for conspiracy to steal motor vehicles and conviction of three
of those defendants upon indictments for conspiracy to receive stolen
motor vehicles, principally evidence relating to three motor vehicles
parked and left by their respective owners and missing upon the
owners' return and relating to master keys found in an apartment oc-
cupied jointly by two of the defendants [751]; the evidence in its
entirety also warranted convictions for larceny and for crimes in con-
nection with motor vehicles other than conspiracies relating thereto
[757].

St. 1968, c. 721, § 2, inserting § 2A in G. L. c. 278, was not retroactive
so as to have required separate trials of conspiracy indictments re-
lating to motor vehicles and indictments for stealing motor vehicles
and receiving stolen motor vehicles, all of which were tried together
prior to the effective date of the statute. [751]

At the trial of an indictment under G. L. c. 266, § 49, for possession of
motor vehicle master keys, evidence that the keys were found "in a
closet-like space between the kitchen and the bedroom" of an apart-
ment occupied jointly by the defendant and another at a time when
both were present there warranted conviction of the defendant, even
though the other person testified that the keys were his and there was
no evidence of joint ownership thereof. [751–753] .

[1] Commonwealth *vs.* Jacob Tarzian, Commonwealth *vs.* Carmen Danese,
and Commonwealth *vs.* Arthur L. Coderre.

A certain affidavit by a police officer accompanying an application for a search warrant for an apartment occupied jointly by two of several defendants indicted for conspiracies and crimes in connection with stolen motor vehicles stated adequate facts based on the "personal knowledge and belief" of the affiant to show compliance with the requirements of G. L. c. 276, § 2B, as amended through St. 1965, c. 384, and probable cause for issuance of the warrant. [755]

Facts set forth in an affidavit by a police officer accompanying an application for a search warrant issued on a certain day, based on his personal observation of motor vehicle master keys in an apartment during a search thereof pursuant to a valid warrant issued on the preceding day, established sufficient grounds for the issuance of the later warrant. [755]

At the trial of indictments, there was no removal of control of the examination of prospective jurors from the judge or legal harm to the defendants resulting from the fact that the clerk, in the presence of the judge and at his direction, asked the customary statutory questions. [755–756]

There was no error at the trial of indictments in the denial of defendants' motions for a voir dire to determine whether there had been "eavesdropping" or "wiretapping" which enabled police officers to know the whereabouts of two of the defendants on a certain day, where the defendants did not make any "representation . . . that the Commonwealth . . . [was] suppressing evidence beneficial" to them and the officers were subjected to a vigorous cross-examination. [756]

There was no error at the trial of indictments in not requiring a police officer to produce his "entire files of notations," where the judge stated that he would permit the defendants "to use anything . . . that . . . [the officer] used to refresh his recollection," or in not requiring another officer to produce his "worksheet," which he did not use at the trial to refresh his recollection. [756–757]

INDICTMENTS found and returned in the Superior Court on May 16, 1967.

The cases were tried before *Beaudreau,* J.

*Reuben Goodman* for the defendants.

*Stanley J. Jablonski,* Assistant District Attorney, for the Commonwealth.

SPIEGEL, J.    Cases involving twenty-eight indictments were consolidated for trial.[2]    Guerro was indicted for operating a motor vehicle "without the authority of the owner . . . after his right to operate without a license

---

[2] We have before us appeals relating to twenty-one of the indictments. The cases of Carlisle B. Mason and William K. Larson, two of the original six defendants, are not before us.

. . . [had] been suspended or . . . revoked." G. L. c. 266, § 28. Guerro and Tarzian were each indicted for receiving motor vehicles "knowing the same to have been stolen," G. L. c. 266, § 28; for possession of motor vehicle master keys, G. L. c. 266, § 49; and for being accessories before the fact of larceny, G. L. (Ter. Ed.) c. 274, § 2. Tarzian, Coderre and Danese were each indicted for theft of a motor vehicle, G. L. c. 266, § 28. Tarzian and Coderre were each indicted for larceny, G. L. c. 266, § 30. Tarzian was charged with removing and changing a motor vehicle identification number. Coderre was also indicted for altering the identification number of a motor vehicle to conceal its identity, G. L. c. 266, § 139. All of the defendants were indicted for conspiracy to steal motor vehicles and except for Coderre for conspiracy to receive stolen motor vehicles. The defendants were sentenced on sixteen indictments. They have appealed under the provisions of G. L. c. 278, §§ 33A–33G. The cases are here on a summary of the record, a transcript of the evidence, and a total of eighty-one assignments of error.

For purposes of clarification we state the relevant portions of the evidence as they relate to each of the motor vehicles involved herein.

### The Stivletta Cadillac.

About 7:30 or 8 p.m. on December 1, 1966, one Nicholas Stivletta parked a 1966 Cadillac convertible, royal blue with a white roof, at Shoppers' World in Framingham and went to a motion picture theatre. When he came out of the theatre at approximately 10:30 or 11 p.m. his car was missing. The motor vehicle identification number was F6147195. In the latter part of November, 1966, one Robert L. Varney received a telephone call from an unknown caller, who inquired whether Varney would be interested in buying a 1966 Cadillac. The caller told Varney that the car had been in an accident, but would be repaired in a "couple of weeks." Varney indicated his interest and on December 2, 1966, the

defendant Tarzian went to Varney's place of employment and asked if Varney "wanted to see the car that he had brought over." Varney went outside and observed a 1966 Cadillac convertible with a blue body and a white top. After Varney drove the car, they went to the Worcester County National Bank where Varney cashed a check for $2,650. After returning to the parking lot of Varney's place of employment, Tarzian "took" out a bill of sale, which Varney signed. Varney then checked the identification number on the bill of sale with the number on the door plate. The number F6226101 appeared in both places. Varney gave Tarzian the $2,650. Tarzian walked away and got into a white Cadillac that had been parked nearby. The bill of sale indicated that one John F. Maloney, 612½ East Fifth Street, South Boston, had been the prior owner of the vehicle.[3] Varney called a telephone operator in an attempt to verify the existence of the person named on the bill of sale. Later that day he traded the Cadillac convertible to Lawless Cadillac for a 1967 Pontiac Grand Prix. On March 2, 1967, one William F. Yetman, a special agent for the National Automobile Theft Bureau inspected a 1966 blue Cadillac convertible at the Worcester police garage. He found that the plastic tab on the door post of the vehicle, with the number F6226101, was a replacement and that the identification number F6147195 located on the right front frame rail was the true vehicle identification number. This number was the same as the one on the original bill of sale for the Stivletta vehicle.

## THE 1966 PONTIAC GTO.

On February 18, 1967, one Russell West parked his 1966 Pontiac GTO convertible, burgundy body with a black top, in the parking lot adjacent to the Jordan Marsh Company store in Bedford, New Hampshire. At 3 P.M. that day, West returned to the place where he had parked his vehicle

---

[3] Maloney had died on November 25, 1966.

and it was missing. The car bore two number plates —
New Hampshire FA404. West next saw the vehicle ap-
proximately two weeks later at the State police barracks
in Grafton, Massachusetts.

In October of 1966, one Clifford M. Auger, a police officer
in the special service division for the city of Worcester,
began a surveillance of the apartment of Guerro and Tarzian
at 17 Bowdoin Street, Worcester. The surveillance was
conducted together with Lieutenant Mulhearn, Officers
William Luby, Leonard Stranieri and R. V. Bryant of the
Worcester police department and several members of the
State police. During the period of observation, Auger had
seen several cars driven by Guerro, Tarzian and Danese.

At approximately 3 P.M. on February 20, 1967, Auger
and Stranieri went to the second floor of the Hertz Rent-A-
Car garage overlooking the parking lot of the Holiday Inn
in the area of Myrtle Street in the city of Worcester. The
officers had with them a pair of binoculars and a camera.
Shortly after arriving at the garage they observed "the
defendant Guerro walk into the driveway of the Holiday
Inn with another person." Guerro and his companion
subsequently left the parking lot and walked around the
Holiday Inn out to Myrtle Street.[4] At 3:55 P.M., Auger
and Stranieri observed a burgundy 1966 Pontiac GTO con-
vertible with a black top drive into the Holiday Inn park-
ing lot, followed by a black sedan, "approximately a 1960,
Cadillac." The Cadillac had Massachusetts registration
plate numbered U872 and was driven by the defendant
Danese. Auger had previously observed the car during his
surveillance at 17 Bowdoin Street. The GTO had a New
Hampshire dealer's registration plate attached to it, bearing
the number 125V.[5] The operator of the GTO was Mason.
Mason and Danese left the vicinity of the vehicles and dis-
appeared from the officers' view. During this interval

---

[4] Officer Stranieri took photographs of Guerro and his companion as they
walked around the Holiday Inn.

[5] The plate had been stolen from the car of Claude Venne, an automobile
salesman, and had been assigned to Dobles Chevrolet, Venne's employer.

Auger left the Hertz garage and after walking to the Holiday Inn parking lot he proceeded to "put a heavy scratch underneath the G of the GTO" with his keys. Auger subsequently went back to the second floor of the garage and observed Danese and Mason come back to the parking lot and move the Cadillac to another space some distance from the GTO. Mason went back to the GTO and Auger, looking through the binoculars, observed Mason "behind the rear seat reaching into the trunk, working in the car." Mason then handed Danese "some long shiny objects."[6] At 4:20 P.M., Guerro reappeared and proceeded directly to the GTO; he spoke with Mason and Danese, then got into the GTO and drove the car to a position from which he was able to converse with Danese and Mason, who had returned to the Cadillac. Apparently, after finishing the conversation, he drove the car out of the parking lot onto the street and out of view.

On February 28, 1967, Officers Auger, Stranieri and Lieutenant Mulhearn were riding in a police car when they observed a burgundy Pontiac GTO convertible drive past them, going in the opposite direction. After turning around to follow the vehicle, they proceeded toward Auburn and Stranieri noticed a burgundy GTO convertible parked at the Whitcomb Machine Company. The officers drove into the Whitcomb parking lot and Auger observed the right rear quarter of the vehicle. He saw a scratch under the G in GTO (the one he had made on February 20, 1967, in the Holiday Inn parking lot), and that the registration plate attached to the vehicle bore the New Hampshire number FA404. This was the same number issued to the missing West vehicle. Shortly thereafter, Officers Auger and Stranieri, again equipped with binoculars and a camera, went to the Gagner Woodworking Company (which is located across the street from the Whitcomb Machine Company) and took a position from which they could observe

---

[6] Russell West, the owner of the Pontiac GTO testified that he "had a fishing pole in the trunk" and officer Auger identified the shiny objects that Mason handed to Danese as "fishing poles."

the GTO in the Whitcomb parking lot. They were subsequently joined by several State police officers and Yetman of the National Auto Theft Bureau. At approximately 1:15 P.M. Larson drove into the Whitcomb Company parking lot. Larson was driving a 1959 white Plymouth, Massachusetts registration number F63359. He parked the car and went directly into the Whitcomb building. During this time, the State police officers and Yetman were positioned in the Gagner Woodworking Company driveway in an unmarked vehicle. About 4:40 P.M., Larson emerged from the Whitcomb building and proceeded to get into the GTO and drive away. Sergeant James A. Baker of the State police followed Larson and stopped the car about a quarter of a mile from the Whitcomb parking lot. Baker advised Larson that the car had been reported stolen in New Hampshire and took Larson into custody. The GTO was then taken to the Grafton State police barracks where a New Hampshire dealer's plate number 125V was found under the seat. On February 26, 1967, Officer R. V. Bryant had seen a 1966 Pontiac GTO convertible, burgundy with a black top, being driven by the defendant Tarzian. At that time the vehicle had a Massachusetts registration plate attached, numbered F63359, the same number plate that was attached to Larson's white 1959 Plymouth.

## THE GIRARD CADILLAC.

On November 22, 1966, about 8 P.M., one Herbert F. Girard parked his 1966 black Fleetwood Cadillac at the Monticello in Framingham. When he returned for the vehicle about 1 A.M. on the twenty-third of November, it was missing.

About the first week in November, one Leroy P. Smith spoke with the defendant Coderre and "told him . . . [he] was in the market for a Cadillac." Smith also told Coderre the type of equipment he wanted in the car. On the sixteenth or seventeenth of November, Coderre again saw Smith and asked Smith if he would take a black Fleetwood

Cadillac. Smith replied that he would "take" it if the car was what he "wanted and it was nice enough." On the twenty-fifth of November, Coderre returned to Smith's place of business with a 1966 black Fleetwood Cadillac. After driving the car, Smith gave Coderre $4,200 and received a bill of sale. Yetman testified that the plastic vehicle identification tab of the Cadillac had been altered from M6137827 to read M6187327.

### THE MASTER KEYS.

Pursuant to a search warrant issued by the Central District Court of Worcester, Sergeant Thomas L. Leahy, Officers Auger, Bryant, Stranieri and Lieutenant Mulhearn of the Worcester police, together with two State police officers went to 17 Bowdoin Street, Worcester. At approximately 9 A.M. Sergeant Leahy entered the second floor apartment through an unlocked door. He observed the defendant Tarzian in the kitchen and the defendant Guerro in his bedroom. Leahy handed each of the defendants the search warrant for their examination. Leahy then proceeded to search the apartment and found nothing in either bedroom or in the living room. However, Lieutenant Mulhearn called Leahy's attention to two rings of keys hanging on a nail in the partition between Guerro's bedroom and the kitchen. After speaking with Leahy, Officer Auger left the apartment for about an hour and returned with an additional search warrant issued by the Central District Court of Worcester. Leahy then took the key rings. In the kitchen an officer also found "two date stamp pads . . . one paid rubber stamp pad, and . . . a tin box with a red colored ink pad inside the box."

One Victor J. Daniels, a locksmith and safe expert, described the keys on one of the rings found at 17 Bowdoin Street as "[k]eys designed to fit General Motors automobiles." One of the keys was designed to fit all makes of General Motors vehicles "up to and including 1966" models. Daniels described the keys on the other ring as "rocker

keys," which are designed so that they "can [be] put . . . in the lock" and rocked back and forth to open a door and ignition.[7] In addition to General Motors rocker keys, there were also American Motors, Chrysler and Ford Motor Company rocker keys.

One Elizabeth McCarthy, an examiner of questioned documents, testified that she examined the bill of sale given to Varney and the one given to Smith; that the notary seal used on each was the same; that the typewritten matter thereon was made by the same typewriter; that the handwritten signature of Vincent Flemmi, the purported owner of the vehicle in the Smith bill of sale, and the handwritten signature of John F. Maloney, the purported owner of the vehicle in the Varney bill of sale, were made by the same person; and that the date stamp seized at 17 Bowdoin Street made the date impressions on both the Varney and Smith bills of sale. She also testified that the "paid" stamp seized at 17 Bowdoin Street made the "paid" impressions on the Varney and Smith bills of sale and that the ink used to make the impressions was the "same shade as the ink in the pad" seized at 17 Bowdoin Street.

1. The defendant Guerro contends that he "could not be found guilty both of receiving the Pontiac GTO knowing it to have been stolen . . . and operating the same GTO without authority of the owner after his license had been suspended." He asserts that "[a] verdict should have been directed on at least one of these indictments." In support of these contentions, Guerro argues that the indictments arose from different clauses of G. L. c. 266, § 28, and therefore "were either inconsistent or the receiving was a lesser offense included in the operating without authority . . . [charge] depending on the intent required for conviction." We do not agree with either of these arguments.

---

[7] Daniels described the rocker keys and their use as follows: "Well, they are so cut away in the back that you can put them in the lock and rock them and pull them and rock them and pull them." He went on to state that after putting the key in the lock, "you rock it up and down raising and lowering the pens, and pull it out; rock it up and down."

We believe the mandate of G. L. c. 266, § 28, as amended through St. 1966, c. 191, § 2, is perfectly clear.[8] Each clause of the statute is separated by the disjunctive conjunction "or," thereby connoting that each offence enumerated in the various clauses is a separate offence which is punishable "by imprisonment in the state prison for not more than ten years." The charge of receiving is not inconsistent with, nor is it a lesser included offence of, the crime of operating a motor vehicle without authority of the owner after the right to operate has been suspended.

Guerro's reliance on the case of *Fletcher* v. *State*, 231 Md. 190, to support the last mentioned point is ill-founded. There the court held that the charges of receiving stolen goods and larceny of the use of a motor vehicle were inconsistent when established by the same evidence. This determination was based on the fact that larceny of the use of a motor vehicle, as distinguished from receiving, was a misdemeanor and did not involve the intent to permanently deprive the owner of his property. Moreover, it is difficult to perceive how one can contend that the crime of receiving is a lesser included offence of unauthorized operation after one's right to operate has been suspended. The elements of the crime of receiving are that the defendant received the motor vehicle knowing that the vehicle had been stolen (see *Commonwealth* v. *Kronick*, 196 Mass. 286, 287–288), whereas the elements of the crime of unauthorized operation after the right to operate has been suspended are operation of the vehicle by the defendant without authority of the owner on a public way after his license has been suspended by the Registry of Motor Vehicles. The only arguable ele-

---

[8] "Whoever steals a motor vehicle *or* trailer, *or* receives *or* buys a motor vehicle or trailer knowing the same to have been stolen, *or* conceals any motor vehicle or trailer thief knowing him to be such, *or* conceals any motor vehicle or trailer knowing the same to have been stolen, *or* takes a motor vehicle or trailer without the authority of the owner and steals from it any of its parts or accessories, *or* without the authority of the owner operates a motor vehicle after his right to operate without a license has been suspended or after his license to operate has been suspended or revoked and prior to the restoration of such right or license to operate or to the issuance to him of a new license to operate, shall be punished by imprisonment in the state prison for not more than ten years or by imprisonment in jail or house of correction for not more than two and one half years" (emphasis supplied).

ment which the crimes may have in common is that in both offences the vehicle is in the possession of the defendant without the owner's permission. This, however, is insufficient to make the receiving a lesser included offence.

2. The defendants claim that "[t]here was no sufficient evidence of separate conspiracies to steal and to receive" and that there should have been directed verdicts on these charges. They also claim that "it was error to try the conspiracy indictments together with the substantive indictments for stealing and receiving automobiles, and a severance should have been granted." We do not agree.

We are satisfied from our review of the evidence that the jury could find that the defendants were engaged in conspiracies to steal and to receive motor vehicles. Argument on this issue does little more than repeat the statements contained in their assignments of error.

In arguing for severance of the conspiracy and substantive charges the defendants urge that G. L. c. 278, 2A (inserted by St. 1968, c. 721, § 2),[9] should be applied retrospectively. However, in the recent case of *Commonwealth* v. *French,* *ante,* 356, 376, we stated that "[w]e see nothing in § 2A which should lead to the application of the section to a trial completed when it took effect, or to indicate that the Legislature intended any retroactive application."[10] The motions for severance were properly denied.

3. The defendant Guerro next contends that "the joint occupancy of the apartment [with Tarzian at 17 Bowdoin Street] was not enough to convict" him of possession of the master keys. He argues that the keys were found "in a closet-like space between the kitchen and the bedroom . . . [of the apartment] and there was no evidence attributing them to . . . [him] rather than to Tarzian."

Guerro, in an attempt to support his argument that joint

[9] "An indictment for conspiracy to commit a substantive offence shall not be tried simultaneously with an indictment for the commission of said substantive offence."

[10] The trial of the instant case took place from October 16 to November 3, 1967. General Laws c. 278, § 2, "could not have been effective earlier than August 18, 1968."

occupancy of the apartment is not enough to show that he was in possession of the keys, cites from the case of *Commonwealth* v. *Maguire*, 108 Mass. 469, 470–471, where this court stated, "The goods were found in the defendant's house, concealed under his coal bin. The fact that his son occupied a part of the house from which this place was accessible, and that he was engaged in business for which the stolen goods were adapted, while the father was not, would raise a reasonable doubt of the defendant's guilt, if possession alone were relied on to establish it." However, the next two sentences of the paragraph from which the defendant quoted furnish, we believe, strong support for the opposite conclusion. The sentences omitted by the defendant read as follows: "The instructions asked for by the defendant are applicable only to such a condition of the evidence. But the case finds that there was other evidence tending to show the defendant's knowledge of and participation in the concealment of the goods where they were found." These sentences plainly suggest to us that if there is other evidence in the case, the jury may determine from that evidence who, in fact, is in possession of the items in question.

Because Tarzian testified the keys were his does not preclude the jury from finding that Guerro had possession of the master keys. Nor does the jury have to find joint ownership of the keys, as Guerro appears to maintain, before a finding could be made that Guerro was in possession of the keys. The jury could so find as long as Guerro had access to the place where the keys were located and could exercise dominion and control over them.[11] *Commonwealth* v. *Tilley*, 306 Mass. 412, 417–418. We are of opinion that the presence of the keys in the apartment, "together with the other circumstances appearing in evidence" amply

---

[11] The judge instructed the jury in relevant part as follows: "First of all, you've got to determine who had possession of the keys, either one or both of them. You heard the testimony about where . . . [the keys] were found, who was in the apartment; that they [Guerro and Tarzian] both lived there; they both had access to the place where the keys were found. Did both Tarzian and Guerro exercise control and dominion over these keys, or just one of them?"

warranted the jury in finding that Guerro was in possession of the keys. *Commonwealth* v. *Johnson*, 199 Mass. 55, 62.

4. The defendants also claim that the "affidavits on which the search warrants of March 6, 1967, and March 7, 1967, were based were inadequate under G. L. c. 276, § 2B [as amended through St. 1965, c. 384], Article 14 of the [Declaration of Rights of the] Massachusetts Constitution and the Fourteenth Amendment to the United States Constitution as it applies the Fourth Amendment to the states." They assert that the items seized pursuant to the above search warrants "should have been suppressed." [12]

The affidavit relating to the March 6, 1967, search warrant discloses the following facts based on the "personal knowledge and belief" of Officer Auger. (1) Since early November, 1966, Auger had been in the Bowdoin Street area "almost daily," investigating the "comings and goings" of Guerro and Tarzian. During the investigation Auger learned that a substantial auto theft ring had been operating in the Lawrence-Haverhill area, and was now operating in Worcester. He stated that neither Guerro nor Tarzian had "gainful means of employment" and that Guerro had "not worked in five years and Tarzian . . . [had] not worked for a year." Neither man had any other source of income. (2) On February 20, 1967, Guerro was seen taking "possession from Carmen Danese of a stolen car at the Holiday Inn parking lot . . . under circumstances that strongly indicated that Guerro knew it was stolen." Guerro was "working in . . . [cooperation] with the said Danese," an individual Auger knew to be "a car thief from Lawrence." The car, a 1966 Pontiac GTO convertible, "color Burgundy with a black top," bearing New Hampshire dealer registration number 125V, was the property of one Jean West of Dover, New Hampshire. Guerro's brother-in-law, William Larson, was subsequently found in possession of the vehicle and arrested for larceny. (3) On

----

[12] Exhibits 51–54 — the paid stamp, a stamp pad and two date stamps (warrant of March 6, 1967). Exhibits 49, 49a, 50 — the master keys (warrant of March 7, 1967).

February 20, 1967, Auger spoke with one Robert L. Varney, who told Auger that on December 2, 1966, Tarzian had sold him a 1966 Cadillac convertible DeVille, identification number F6226101, for $2,650. The car was worth approximately $4,500. Tarzian gave Varney a printed bill of sale "purportedly signed by one John F. Maloney." The bill of sale was "stamped paid with a rubber hand stamp bearing a cranberry ink and also bears a Notary Public seal of one Harold Pomfret of Rhode Island and it appears to be a form used from Automotive Wares, Inc., Rocky Hill, Connecticut — (Form 401)." The Cadillac had been stolen from Stivletta Corporation of America on December 1, 1966. (4) Further investigation disclosed a bill of sale in "the possession of Jeanne Pichierro . . . the half-sister of . . . Guerro" on the same type of form "and in its printed aspects is exactly the same as the one given Varney by Tarzian." The bill of sale dated October 14, 1966, purported to transfer a 1966 Ford, two-door coupe, bearing serial number 5Y85Z113422. However, this identification number "actually" belonged to a stolen Thunderbird. (5) One Frederick Parmenter, Jr., "a known associate and close friend" of Guerro was in possession of a bill of sale dated January 9, 1967, on the same form as Varney's and Pichierro's. The bill of sale "also has the PAID stamp in cranberry or red ink" and "the notary seal of T. Harold Pomfret, Notary Public of Rhode Island." Detective Ralph Doyle of Auger's division had a conversation with Parmenter, and Doyle informed Auger "that Parmenter when asked . . . about having a 'hot car' said I've been taken but don't worry I'll get my money back." Although the bill of sale purports to transfer a 1966 Pontiac GTO hardtop, serial number 242076G127333 to Parmenter, "a qualified expert from the National Automobile Theft Bureau" has examined the car, and states "that the vehicle identification number on the door jam tab is different from the concealed number on the frame." Although unable to ascertain the "true owner of this vehicle," Auger believed that the car was stolen.

The affidavit which accompanied the warrant issued on March 6, 1967, disclosed that for a period of about four months Guerro and Tarzian were under surveillance by the police. This surveillance of the defendants, and the police investigation of related matters "were neither isolated instances nor remote in time from the application for the warrant." *Commonwealth* v. *Ellis*, 356 Mass. 574, 577–578.

As we stated in the case of *Commonwealth* v. *Moran*, 353 Mass. 166, 170, "We believe that the information contained in the . . . [affidavit], taken as a whole, together with the inferences which reasonably could be drawn from such information provided ample justification for a judicial mind to conclude the existence of probable cause."

The personal observations related by Auger were sufficient statements of underlying facts to permit the issuance of the search warrant. The affidavit complied with the provisions of G. L. c. 276, § 2B. *Commonwealth* v. *Penta*, 352 Mass. 271, 275–276.

The facts set forth in the affidavit accompanying the warrant issued on March 7, 1967, were based on Auger's personal observation of the master keys during the search of the apartment pursuant to the warrant issued March 6, 1967. These facts established "sufficient grounds for the issuance of the warrant." *Commonwealth* v. *Penta, supra,* at 274. The motions to suppress were properly denied.

5. We next consider the defendants' argument that it was a violation of G. L. (Ter. Ed.) c. 234, § 28,[13] for the clerk, rather than the judge, to ask the questions prescribed by that statute.

The clerk, in the presence of the judge and at his direction, asked the jurors the customary statutory questions. When the judge felt that further inquiry of a juror should be

[13] "Upon motion of either party, the court shall, or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead."

made, he, not the clerk, asked the additional questions. The judge in no way abdicated his authority or abandoned his discretion. He, and he alone, determined whether a juror stood indifferent. Control of the examination of the jurors was not taken from the court and we do not interpret the fact that the clerk asked the statutory questions, rather than the judge, as having that effect. In any event, no legal harm resulted to the defendants. *Commonwealth* v. *Cero,* 264 Mass. 264, 270–271.

6. We now turn to the contention of Guerro, Tarzian, and Danese that the judge was in error in denying their motions for a voir dire (a) "to determine whether or not there's been eavesdropping . . . [or] wiretapping" which enabled Auger and Stranieri to know that Guerro and Danese would be at the Holiday Inn on February 20, 1967, and thus "were . . . [deprived of] an opportunity to show that evidence introduced against them was obtained as the result of wiretapping"; and (b) that there was error in not requiring "Auger [to] produce his notes and . . . Stranieri [to] produce his worksheet."

With regard to point (a), as the judge noted, these defendants did not make any "representation . . . that the Commonwealth . . . [was] suppressing evidence beneficial to . . . [them]." We note, too, that at the trial both Auger and Stranieri were subjected to a vigorous cross-examination in an effort to determine the reason for their presence at the Holiday Inn. There was no error in the denial of a voir dire. The judge reasonably exercised his discretion. *Commonwealth* v. *Nassar,* 354 Mass. 249, 259. *Commonwealth* v. *Martin, ante,* 190, 192–193.

In regard to point (b) the record reveals that the defendants made a "demand . . . for . . . [Auger's] entire files of notations." The judge refused that "demand" and stated that he would permit them "to use anything . . . that . . . [Auger] used to refresh his recollection." In regard to the "worksheet," Stranieri did not use it at the trial to refresh his recollection and testified that he last saw it about six months previously. The judge was not required

to compel Auger to produce his "entire files of notations" and Stranieri to produce his "worksheet." *Leonard* v. *Taylor,* 315 Mass. 580, 583–584.

7. Finally, several assignments of error are referred to in the defendants' brief on the basis that there was "no sufficient evidence to convict." The arguments advanced on this theory are, in effect, summarily referred to and require no extended comment. Our review of the record creates no doubt whatever that the evidence in its entirety fully warranted the convictions.

*Judgments affirmed.*