COMMONWEALTH *vs.* TERRELL WALKER.

Suffolk.    December 1, 1975. — June 24, 1976.

Present: HENNESSEY, C.J., REARDON, QUIRICO, BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Homicide. Search and Seizure. Constitutional Law,* Search and seizure. *Probable Cause. Arrest. Practice, Criminal,* Production of evidence, Challenge of jurors, Fair trial, Instructions to jury, Examination of jurors, Location of defendant in court room, Capital case. *Identification. Evidence,* Other offense, As to credibility of witness, Cross-examination, Judicial discretion, Of insanity. *Insanity.*

At a murder trial, evidence that police officers went to an apartment where the defendant was hiding, knocked loudly and demanded entry, that they did not use trickery or threats to gain entrance, and

that the lessee of the apartment admitted the police because she was afraid of the defendant warranted a finding that her consent to the entry and search was freely and voluntarily given. [554-556]

Where findings were warranted that the lessee of an apartment gave her consent to a search of a bedroom and that police officers who had observed someone peering from the bedroom window were justified in entering the bedroom to ascertain whether any person was in that room, there was no error in the denial of a motion to suppress guns found in plain view in the bedroom. [556-558]

At a murder trial, where the lessee of an apartment voluntarily consented to police entry, information obtained from the lessee could be used as a basis for probable cause to arrest two codefendants and there was no error in admitting testimony of the two codefendants and another who was present in the apartment at the time of the entry. [558-559]

Where there was probable cause to arrest a defendant for murder and robbery and where, even if there had not been probable cause, the arresting officer, who knew of the existence of two outstanding warrants against the defendant, was justified in making the arrest, there was no error in admitting in evidence a pair of sneakers taken from the defendant at the time of his arrest. [559-560]

At a murder trial, there was no error in the admission of testimony by a police officer that at the time he arrested the defendant he was aware of two outstanding warrants issued against the defendant previously, where the testimony was not admitted as probative of the contents of the warrants but only to show probable cause to arrest the defendant. [560-561]

At a murder trial, where consent had been found to the police entry of an apartment, there was no error in the exclusion of various questions designed to show that testimony of the lessee was "tainted" by an illegal entry. [561-562]

There was no abuse of discretion in a judge's denial of various motions to produce tapes of interviews with a witness or the grand jury testimony of a witness for the purpose of refreshing the recollection of police interviewers. [562-563]

At the trial of an indictment for murder, there was no merit in a contention by the defendant that his constitutional rights against self-incrimination and to a fair, impartial jury were violated by the requirement that the defendant, after consultation with his attorney, personally announce his contentment or dissatisfaction with prospective jurors even though the defendant raised an insanity defense; the prosecutor's reference in his closing argument to the defendant's exercise of his peremptory rights, though better omitted, was not prejudicial to the defendant. [563]

At a murder trial a witness's out-of-court identification of the defendant during a jury view of the scene eight months after the crime was admissible where the witness's identification was made spontaneously during a chance encounter, despite the fact that the witness had not been able to identify the defendant on the day of the crime. [563-565]

At a murder trial there was no error in the admission of a witness's out-of-court identifications of the defendant from photographs and at a lineup where there was nothing impermissibly suggestive in either procedure and where the witness's equivocal identification at

Commonwealth *v.* Walker.

the lineup was brought to the jury's attention; there was no error in the judge's failure to make explicit findings as to whether an independent basis existed for the witness's in-court identification of the defendant where he had made specific findings that the witness's out-of-court identifications were proper. [566-568]

At a trial for murder and robbery, a witness's testimony that he and the defendant had a stolen car which they decided not to take to the scene of the robbery was admissible where any prejudice to the defendant was outweighed by the probative value of the statement on the issue of criminal intent. [568-569]

At a murder trial, a mistrial was not required by the fact that a police officer testified as to a witness's identification of the defendant and the testimony was then struck, where the judge gave cautionary instructions at the first opportunity and questioned the jurors regarding any influence or prejudice the statement may have created in their minds against the defendant. [569-570]

Where a defendant had purportedly impeached a witness through use of a portion of a transcript of the witness's pre-trial testimony, there was no error in allowing the Commonwealth to introduce in evidence another portion of the transcript to show that the specified few responses in her pre-trial testimony, to which the defendant had referred, were not inconsistent with her trial testimony. [570-571]

At a trial for first degree murder where it was stipulated that a witness would be permitted to plead guilty to murder in the second degree if he testified against the defendant, there was no error in the exclusion of defense counsel's questions to the witness as to his motivation for testifying; nor was there error in the exclusion of questions as to the witness's refusal to testify at a pre-trial hearing on a motion to suppress. [571-572]

At a murder trial, there was no error in the refusal of the trial judge to ask prospective jurors whether they would give greater weight to the testimony of a police officer than to that of a private citizen nor in his refusal to allow the defense counsel personally to ask voir dire questions of the prospective jurors. [572-573]

At a trial for first degree murder and robbery, the judge did not abuse his discretion in refusing to allow the defendant to sit at the counsel table rather than in the prisoner's dock. [573-574]

There was no error in a criminal trial in the judge's remarks in his instructions that the defendant could appeal the jury's verdict but the Commonwealth could not where, taken as a whole, the judge's instruction was designed to protect the defendant from prejudice by explaining why the defense counsel took exceptions to various rulings and the prosecutor did not. [574-576]

At a murder trial, there was no error in allowing a witness, whose in-court identification of the defendant was excluded because an impermissibly suggestive photographic display had been shown to her prior to trial, to testify that she could identify two men at the scene of the crime who did not shoot the victim and that they were not in the court room. [576-577]

At a murder trial in which the defendant introduced expert testimony that he was insane at the time of the crime, the judge correctly instructed the jury on the use of the presumption of sanity and on the Commonwealth's burden of proving sanity beyond a reasonable doubt. [577-582]

Upon a verdict of guilty on indictments charging first degree murder and armed robbery, where there was evidence at trial that the defendant engaged in a carefully considered, intelligent plan to commit the crimes, even though two qualified experts expressed the opinion that the defendant was insane at the time of the crimes and the Commonwealth produced no contrary testimony, the defendant's evidence as to insanity was not so compelling as to require reversal under G. L. c. 278, § 33E. [582-583] HENNESSEY, C.J. (dissenting, with whom KAPLAN, J., joined). LIACOS, J., concurring.

INDICTMENTS found and returned in the Superior Court on December 13, 1973.

A pre-trial motion to suppress evidence was heard by *Taveira, J.,* and the cases were tried before him.

*Norman S. Zalkind & Eric D. Blumenson (Stephen L. Saltonstall* with them) for the defendant.

*Newman A. Flanagan,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant was tried before a jury on five indictments charging him with murder in the first degree and armed robbery, and was convicted on all five indictments. He was sentenced to life imprisonment on the murder charge and to fifteen to twenty-five years' imprisonment on each of the armed robbery indictments, the terms of years to be served concurrently with the life term. The defendant prosecutes these appeals under G. L. c. 278, §§ 33A-33G.

We find no error in the rulings of the trial judge, and consequently we affirm the judgments. Further, a majority of the Justices participating in this decision are of the opinion that "justice in [this] particular case" (*Commonwealth* v. *Geraway,* 364 Mass. 168, 184 [1973] [Tauro, C.J., and Braucher, J., dissenting]) does not require that we exercise the discretion vested in us under G. L. c. 278, § 33E.[1]

---

[1] The author of this opinion is compelled to express the view, which can be found in a dissent *infra,* that the judgment should be reversed, the verdicts set aside, and a new trial granted in this case through application of our discretionary power under G. L. c. 278, § 33E. See *Commonwealth* v. *Kostka, ante,* 516, 539-540 (1976) (Hennessey, C.J., and Kaplan, J., dissenting).

We turn now to a discussion of the defendant's numerous assignments of error seriatim.

The facts are as follows. Sometime around noon on November 30, 1973, three men with guns robbed a pawnshop on Washington Street in Boston. While the robbery was in progress, one of the armed men struggled momentarily with and killed a plain-clothed Boston police officer who happened to be inside the pawnshop at the time.

Responding to the robbery and murder, several police officers, including Detective Louis McConkey of district 2 of the Boston police department, showed the customers and employees of the pawnshop numerous photographs of possible suspects. Tentative identifications of at least two individuals, Terrell Walker and his brother, Arnold, were obtained.

In the late afternoon of that same day Detective Mc-Conkey and a contingent of plain-clothed police officers from districts 2 and 11 sought entry into a Columbia Point housing project apartment leased to Darlene Freeman, Arnold Walker's fiancée.[2] Among the officers accompanying Detective McConkey was Detective Frank Olbrys, who was aware of two outstanding warrants for the arrest of Terrell Walker.

The police officers surrounded the ground level apartment, knocked loudly on the door, and demanded entry. Although there was no immediate response from within, the police deduced that the apartment was occupied because they could hear noises emanating from inside the apartment and because someone was observed peering out a side bedroom window after peeling back the corner of a drawn shade. A passkey was obtained to facilitate the police entry, but it was not until a bolt on the inside of the apartment door was released by Ms. Freeman that the police actually found themselves inside.

---

[2] Detective McConkey knew Ms. Freeman, having talked to her approximately two or three months prior to November of 1973 on an unrelated matter. At that time he learned that Ms. Freeman was Arnold Walker's fiancée, and that Terrell Walker possessed a firearm.

Considerable confusion ensued. It is at least clear, however, that the defendant was asked his name and responded falsely, and that Detective Olbrys identified him as Terrell Walker and placed him under arrest. Detective McConkey took Ms. Freeman aside to find out what she might know about the pawnshop incident, while other officers fanned out throughout the apartment to gather up any remaining individuals they might discover therein. During the course of Ms. Freeman's conversation with Detective McConkey it was revealed that a gun or guns were in one of the bedrooms. Two guns were eventually recovered from a bedroom, and various other items of evidence connected with the pawnshop robbery were discovered and seized during the police occupation of the apartment.[3] Arnold Walker (now also under arrest) and other persons in the apartment, including Ms. Freeman and the defendant, were taken to police headquarters. From Ms. Freeman investigating officers learned the identity of two individuals allegedly involved with the defendant in the robbery and murder. Nathaniel Williams and Anthony Irving were later apprehended with the murder weapon among their possessions.

An extensive and comprehensive hearing was held before trial to consider the defendant's motion to suppress the evidence obtained by the police at Ms. Freeman's apartment.[4] The judge found that Ms. Freeman had know-

---

[3] One of the guns seized was the police department revolver issued to the slain Boston police officer; also taken were a medallion and three rings found under a mattress in one of the bedrooms, a hatful of rings and watches discovered under a chair in one of the bedrooms, and a ring found in the pocket of a pair of trousers. With the exception of the two guns, these items of evidence were suppressed from introduction at trial by the judge, who found at a preliminary hearing on the defendant's motion to suppress that Ms. Freeman had not given any general consent to the search of her apartment and that these items were not in plain view.

[4] The judge found as a preliminary matter that the defendant had standing to object to the search of the apartment. See *Commonwealth* v. *Deeran,* 364 Mass. 193, 195 (1973); *Commonwealth* v. *Dirring,* 354 Mass. 523, 531-533 (1968); *Brown* v. *United States,* 411 U.S. 223, 229 (1973); *Jones* v. *United States,* 362 U.S. 257, 267 (1960).

ingly, intelligently and voluntarily consented to the police entry and presence in her apartment and that the two guns found in one of the bedrooms were found by the police in plain view. The judge further found that the defendant had been arrested on probable cause and also on the two warrants for his arrest which were outstanding. Ms. Freeman's later statements to the police, in which she inculpated Williams and Irving, were found by the judge to be the result of an intervening, independent act on her part to supply information to the police, and were not deemed to be tainted in any way by the entry and search of her apartment. We have mentioned elsewhere in this opinion the judge's disposition with regard to other items of real evidence seized at the apartment. See note 3 *supra.*

1. It is uncontroverted that the police had no search warrant covering Ms. Freeman's apartment.[5] The paramount question then becomes, broadly, Has the prosecution carried its burden of showing the existence of some one of the " '. . . few specifically established and well-delineated' " exceptions to the warrant requirement? *Vale* v. *Louisiana,* 399 U.S. 30, 34 (1970), quoting from *Katz* v. *United States,* 389 U.S. 347, 357 (1967).

The prosecution demonstrated, primarily through the testimony of Detective McConkey and Ms. Freeman, that the police entered her apartment and confiscated at least the two guns which were introduced in evidence as a result of Ms. Freeman's consent to that entry and search. That Ms. Freeman, as lessee of the apartment, and one on the premises at the time of the entry and search, could give a valid consent is not disputed. The issue narrows, we think, to whether, in all the circumstances, her consent to the entry and search can be said to have been freely and voluntarily given. *Commonwealth* v. *Mendes,* 361 Mass. 507, 512

---

[5] The record does not require a finding that the police went to the apartment for the purpose of searching it. For all that appears, it is reasonable to assume that the police initially went there only to question Ms. Freeman. The show of strength by the police is not inconsistent with this assumption in view of the police knowledge that three armed men had already killed one police officer and were still at large.

(1972). *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 222 (1973). *Bumper* v. *North Carolina,* 391 U.S. 543, 548 (1968).

Decisions of this court and of the United States Supreme Court make it clear that "consent freely and voluntarily given" means consent unfettered by coercion, express or implied, and also something more than mere "acquiescence to a claim of lawful authority." *Bumper* v. *North Carolina, supra* at 549. The fact that a person is not informed by the police that he has an unqualified right to refuse to consent to an entry or search is "a factor to be taken into account" on the issue of voluntariness, but is by no means determinative of that issue. *Schneckloth* v. *Bustamonte, supra* at 248-249.

In the instant case, determined as the police were to enter the Freeman apartment, they did not utilize trickery or threats to gain entrance to the dwelling. In considering all the circumstances, we must take into account not only the conduct of the police but also the conduct and statements of persons inside the apartment prior to the police entry.

At the preliminary hearing the judge would have been warranted in finding that, after the loud knocks on the apartment door, someone inside the apartment went to a bedroom window, pulled the shade back, and informed those inside the apartment that there were "cops" all around the building. Ms. Freeman's three children were watching television in the apartment at that time. The apartment occupants argued with the defendant, who expressed his intention not to go to jail by stating that "[t]he only way to get me is take me out of here in a pine box." There was talk of guns by the defendant. A shootout seemed imminently possible. Ms. Freeman was frightened — not of the police, but of the defendant and what he might do to avoid arrest.

We conclude, as the trial judge did, that it was this atmosphere of tension and fear of the defendant which prompted Ms. Freeman to admit the police in the first instance. In these circumstances the judge was warranted in

concluding that her consent was freely and voluntarily given since the only element of fear was injected by the defendant's conduct, which was unknown to the police at the time they sought entry into the apartment. In view of the limited information possessed by the police before they entered the apartment and the spontaneity of their action as the situation developed, the circumstances here are distinguishable from those in the case of *Commonwealth* v. *Forde,* 367 Mass. 798 (1975), and more closely approximate the circumstances surrounding the warrantless entry into an apartment which we recently upheld in *Commonwealth* v. *Moran, ante,* 10 (1976). There was no error.

2. We turn now to the judge's findings and rulings as to the search conducted by the police once they were inside the Freeman apartment. Two independent grounds were offered to justify the seizure of the guns which were found in one of the apartment bedrooms. On the one hand, the judge found that these guns were discovered in plain view by one of the officers who entered the bedroom to ascertain whether that room was the one from which someone had been observed peering out; on the other hand, the judge found that Ms. Freeman expressly consented to a search of the bedroom for the guns while she was conversing with Detective McConkey.

In our view the judge could properly rely on either of the two grounds cited by him. A finding was warranted that Ms. Freeman gave consent to the search of the bedroom for guns, and this permissible finding justified the police action.

Even if we were to assume, as urged by the defendant, that Ms. Freeman gave no consent to search the bedroom, we conclude that the search also was justified on the second ground cited by the judge, for it is clear that in light of what the police observed and learned immediately on entering the apartment, they then were justified in entering the bedroom at least for the purpose of ascertaining whether there was any other person in that room. This investigation generally was justified in the interest of safety of the police and the occupants of the apartment, and par-

ticularly justified by the observation that someone had earlier looked out of that window toward the police outside. Since the police were lawfully in the bedroom, we need only consider whether the requirements of plain view were met. *Coolidge* v. *New Hampshire,* 403 U.S. 443, 465-473 (1971).

The plain view doctrine requires prior police justification for an intrusion in the course of which an officer inadvertently comes across incriminating evidence. The "prior justification" language is merely another way of articulating the necessity for "some . . . legitimate reason for being present unconnected with a search directed against [an] accused." *Coolidge* v. *New Hampshire, supra* at 466. The inadvertence requirement simply lends credibility to the doctrine by ensuring that only evidence which the police did not *anticipate* or *know* to be at the locus of a search will be seized without a warrant. When the plain view doctrine is relied on to justify a warrantless seizure of evidence, attention must be paid also to seeing that the police, in full possession of probable cause to believe that incriminating evidence is present in a particular place, have not waited until an opportune moment to "place themselves in a position to gain a plain view of the evidence." *Commonwealth* v. *Forde,* 367 Mass. 798, 809 (1975) (Hennessey, J., concurring in result).

The testimony before the trial judge on the motion to suppress revealed that Detective McConkey knew that the Freeman apartment was not the residence of the defendant. No officer testified to a reasonable belief that the defendant would be found within the apartment. There was no evidence that the police officers involved even anticipated an occasion to search the Freeman apartment, much less that they knew or anticipated that evidence related to the pawnshop robbery and murder might be located there. As for the inadvertence requirement, in making his finding on plain view the judge would have been justified in relying on the testimony of Detective Richard Driscoll, as corroborated by other police officers present at the time, that Detective Driscoll discovered the uncon-

cealed guns, one of which he immediately recognized as a Boston police officer's revolver, while turning to leave the bedroom after checking the window. We conclude that it was not error to admit the two guns in evidence.

3. The defendant based his next two related assignments of error on the premise that no valid consent to enter the Freeman apartment could be demonstrated in all the circumstances. That being the case, he argues, all evidence obtained as a product of the "illegal" police presence would be inadmissible at trial absent a showing that it was independently arrived at. Specifically, he contends that the police could not base probable cause to arrest Nathaniel Williams and Anthony Irving on the information obtained from Ms. Freeman at police headquarters after the "illegal" entry, nor could the prosecution use the testimony of these two accomplices or of Anthony Dobson, who was in the apartment both earlier on the day of November 30, 1973, and during the "illegal" police entry. Cf. *Commonwealth* v. *Bumpus*, 362 Mass. 672, 674-675 (1972).

These two assignments of error fail even without application here of the familiar "fruit of the poisonous tree" approach.[6] *Commonwealth* v. *Spofford*, 343 Mass. 703, 707-708 (1962). *Wong Sun* v. *United States*, 371 U.S. 471, 487-488 (1963). *Nardone* v. *United States*, 308 U.S. 338, 340-341 (1939). *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392 (1920). That principle is essentially concerned with whether the use of secondary evidence — that evidence which may have been arrived at through exploitation of the primary illegality — will in any way encourage police misconduct. We have upheld the trial judge's ruling

---

[6] The trial judge chose to rest his denial of the defendant's motion to suppress Ms. Freeman's statements and the testimony of Williams and Irving on the finding that these statements resulted from an "intervening, independent act" on her part to supply information to the police. This approach seems sound, but, in light of our agreement with the trial judge that there was no primary illegality, it is unnecessary for us to pursue it further. The same can be said of the defendant's claim regarding Anthony Dobson's testimony.

We do note that Ms. Freeman was not under arrest when she gave information to the police later that same day. Compare her situation with the facts in *Michigan* v. *Tucker*, 417 U.S. 433 (1974).

on the voluntariness of Ms. Freeman's consent to the police entry of her apartment, thus removing any stigma of "taint" from whatever information Ms. Freeman later gave, and from the testimony elicited from the three other witnesses.

4. The defendant contends that it was error to deny his motion to suppress from evidence a pair of Converse sneakers taken from him after his arrest.[7] In pressing this contention, the defendant says that his arrest was unlawful (1) because the police entered a dwelling without either an arrest or a search warrant; (2) because there was no probable cause to believe that the defendant was in the apartment; and (3) because the police did not have probable cause to believe that the defendant had committed a crime.

We have already disposed of the issue as to the police entry into the apartment. Beyond this, the trial judge concluded that the sneakers were properly taken as part of a legitimate search incident to arrest. He based his conclusion on the alternatives that the defendant was arrested on probable cause relating to the pawnshop robbery and murder, and that there were two outstanding warrants for the defendant's arrest, the existence of which were known to the arresting officer. We fully agree with the trial judge's conclusions as to both grounds on which he relied.[8]

---

[7] The sneakers were a material item of evidence linking the defendant with the crime since the slain policeman's murderer, after the shooting and at a time when considerable blood was on the floor of the pawnshop, straddled the body and removed the officer's wallet and service revolver. Impressions from the tread pattern of the murderer's sneakers, found in dried blood on certain tiles from the floor of the pawnshop, could have been made by the sneakers worn by the defendant at the time of his arrest. Additionally, expert testimony showed that there were small particles of dried human blood, type O, on the defendant's sneakers; the slain policeman had type O blood.

[8] Even if the police purported to act under the warrants, and seized the sneakers pursuant to their investigation of the murder and robbery, which was unrelated to the warrants, no invalidity of the seizure is established since there was probable cause relating the defendant to the murder and robbery. See *Commonwealth* v. *Tarver,* 369 Mass. 302, 306, 308 (1975).

Commonwealth *v.* Walker.

Even if we were to agree with the defendant's contention that there was no probable cause to arrest him on the murder and robbery charges then being investigated, there was testimony by at least two officers present at the apartment that they were aware of two extant warrants for the defendant's arrest.[9] One of the officers who testified to a knowledge of the existence of these two warrants was, in fact, the complaining officer in connection with one of the two warrants. This officer further testified, over objection and exception of the defendant, that while on patrol a week or two before November 30, 1973, he had seen the defendant, and that the defendant had fled when the officer got out of his vehicle to apprehend him. It was this officer who identified the defendant and placed him under arrest after the entry into Ms. Freeman's apartment.

The legality of the defendant's arrest in the circumstances described above is beyond question. The police need not carry arrest warrants around on their persons. Compare *Commonwealth* v. *Bowlen,* 351 Mass. 655, 659-660 (1967), with Mass. R. Crim. P. 5 (c) (3) (Tent. Final Draft, Feb. 1976). This is not a case where law enforcement officers employed some ruse or acted in bad faith to conceal an absence of probable cause to arrest an individual. See *Wilson* v. *United States,* 325 F.2d 224, 225-226 (D.C. Cir. 1963), cert. denied, 377 U.S. 1005 (1964). Cf. *Bumper* v. *North Carolina,* 391 U.S. at 549 n.14; *Mapp* v. *Ohio,* 367 U.S. 643, 644-645 (1961). "Unlike probable cause to search, probable cause to arrest, once formed will continue to exist for the indefinite future, at least if no intervening exculpatory facts come to light." *United States* v. *Watson,* 423 U.S. 411, 449 (1976) (Marshall, J., dissenting).

5. The defendant challenges the trial judge's admission in evidence at the hearing on the motion to suppress the testimony of Detective Frank Olbrys that he was aware of the existence of two warrants issued previous to the defend-

---

[9] The defendant has not argued that there was no probable cause for the issuance of these two warrants.

ant's arrest. This testimony was accepted on the issue of
probable cause to arrest the defendant, and was admitted
only to show the knowledge of the arresting officer and to
determine whether he acted prudently in the circum-
stances. The defendant's challenge to the admission of this
testimony, bottomed as it was on the best evidence rule,
has no merit. The oral testimony was not received as pro-
bative of the contents of the arrest warrants. It is well
settled that the rule has no application to an attempt to
show, among other facts, the existence of a document or
action taken by persons in reliance on a document's exist-
ence. See W.B. Leach & P.J. Liacos, Massachusetts Evi-
dence 263 (4th ed. 1967); K.B. Hughes, Evidence § 404
(1961).

6. Several of the defendant's allegations of error relate
to the correctness of excluding certain questions asked by
defense counsel at the suppression hearing. The excluded
questions were designed to show that the police "exploited"
their "illegal" entry of the Freeman apartment by inter-
rogating Ms. Freeman to obtain further evidence regard-
ing participants in the crimes. In the same vein, the judge
denied the defendant's motions to produce a tape of the
Freeman interview by police, to listen to the tape in cam-
era, and to produce the tape and statements of Ms. Free-
man for the purpose of refreshing the recollection of the
police interviewers. Also excepted to is the denial of the
use of Ms. Freeman's grand jury testimony to refresh
the recollection of one of the police interviewers, and the
striking of testimony of one officer to the effect that Ms.
Freeman had told certain officers, on the way to police
headquarters, that someone had taken some of the fruits of
the robbery "and gone south."

We have fully examined the pertinent portions of the
transcript relating to these assignments of error. The trial
judge was correct in his rulings on the evidentiary matters
and on the several motions. Since the trial judge con-
cluded that there was no primary illegality in the police
conduct, and that Ms. Freeman voluntarily consented to
the police entry of her apartment, the attempt to show

"taint" could not have been material to the judge's ultimate conclusion.

At any rate, the defendant had ample opportunity to examine Detective McConkey, Sergeant Frank Mulvey, and the head of the Boston police department homicide unit, as to the circumstances of Ms. Freeman's questioning and the information obtained from her. The only questions excluded by the judge were either leading or called for a hearsay response by the witness McConkey. With respect to one question an offer of proof was made to the judge, but in light of the expected testimony and our conclusion that Ms. Freeman's statements were not tainted, we do not see how the defendant was prejudiced. The witness Mulvey demonstrated through his response to the questioning of defense counsel that he really "couldn't say" whether Ms. Freeman specifically mentioned Williams and Irving by name, and defense counsel was fully permitted to elicit from the witness the few particulars he could recall concerning Ms. Freeman's questioning.

The police tapes were the subject of a pre-trial motion for production which was denied by the judge. They were not utilized by the prosecution for any purpose during the hearing on the motion to suppress. There is nothing before us to show that the tapes contained statements inconsistent with the testimony of the witness in court. We have said in the past, and we reaffirm that principle here, that a defendant does not have an absolute right to have material of this nature produced for his use or inspection at trial. This is a matter which ordinarily rests in the trial judge's sound discretion. *Leonard* v. *Taylor*, 315 Mass. 580, 583-584 (1944), quoting from *Goldman* v. *United States*, 316 U.S. 129, 132 (1942). But cf. *Commonwealth* v. *Marsh*, 354 Mass. 713, 721-722 (1968). Where notes, memoranda, tapes or the like have not been used to refresh a witness's recollection, they, likewise, are not automatically to be made available to the defense, especially when their use would be ostensibly for the purpose of refreshing the memory of some other witness. This is the clear implication of our reasoning in *Commonwealth* v. *Guerro*, 357 Mass. 741,

Commonwealth v. Walker.

756-757 (1970), and nothing said by this court with regard to grand jury minutes in *Commonwealth* v. *Stewart,* 365 Mass. 99, 105-106 (1974), can be construed to the contrary.

7. The defendant was required personally to exercise his peremptory rights in selecting the jury. He was directed to say either "I am content" or "I challenge." The use of this procedure is denominated error in that it violated the defendant's rights against self-incrimination and to a fair, impartial jury. Further, the defense cites prejudice in the prosecutor's reference to the defendant's exercise of these rights during his closing argument to the jury.[10]

We reject this claim of error. The practice used in this Commonwealth in cases of murder in the first degree to require a defendant, after consultation with his attorney, personally to announce his contentment or dissatisfaction with prospective jurors is sound. The practice does not require additional justification simply because the defense to the indictments is that the defendant, *at the time of commission of the offense,* was not legally responsible for his actions. *Commonwealth* v. *Millen,* 289 Mass. 441, 476-477, cert. denied, 295 U.S. 765 (1935). Though the better approach is for the prosecutor to refrain from any reference to the exercise of peremptory rights in a case such as this one, we believe that the reference made by the prosecutor here was cured by clear instructions to the jury by the trial judge on this matter.

8. The witness Margulis, an employee of the pawnshop, was allowed after extensive voir dire questioning by both sides, to identify the defendant as the one who shot the police officer. The witness's in-court identification of the defendant was bolstered by testimony that the witness spontaneously identified the defendant as the murderer some eight months after the crime, when the witness ob-

---

[10] In closing, the prosecutor stated: "Ask yourself about this particular defendant. What do you think? Do you think he knew what he was doing when he stood up there and said, 'I am content with this juror? I am content with this juror? I am content with this juror?' Do you think he knew what he was doing then?"

served the defendant at the pawnshop while a view of the scene was being conducted for the jury's benefit. The defendant claims that both the out-of-court and the in-court identifications should have been excluded by the trial judge, the former because it was the result of a procedure so unnecessarily suggestive and conducive to irreparable mistaken identification as to amount to a violation of due process, the latter because it was the product of the suggestive procedure. *Commonwealth* v. *Kazonis,* 356 Mass. 649, 651-653 (1970), and cases cited. See *Neil* v. *Biggers,* 409 U.S. 188, 198-199 (1972) ; *Foster* v. *California,* 394 U.S. 440, 442-443 (1969) ; *Stovall* v. *Denno,* 388 U.S. 293, 302 (1967).

The defendant points out that Margulis did not pick out a photograph of the defendant (or of anyone else, for that matter) shortly after the incident, that the witness did not accurately describe the police officer's assailant when interviewed by the police on the day of the incident, and that Margulis did not identify the defendant at a lineup on the evening of the incident.[11] He further emphasizes that the Commonwealth pressed the view at the pawnshop and the handcuffing of the defendant during all phases of the view, and that the witness's testimony, offered on voir dire, was replete with contradictions to a statement given to the police on the day of the crimes regarding his ability to identify the assailant.

As to the suggestiveness of the "confrontation" on the view, the trial judge found that Margulis recognized the defendant right away as the one who shot the police officer, and that this recognition came without questioning or suggestion from anyone. The due process right to a fair trial is violated when the totality of the circumstances surrounding an out-of-court confrontation shows that there is " 'a very substantial likelihood of ... misidentification.' " *Neil* v. *Biggers, supra* at 198, citing *Simmons* v. *United States,* 390 U.S. 377, 384 (1968). However, the concept of

---

[11] On voir dire the defendant brought to the judge's attention that Margulis had stated at the lineup that "I only saw the one guy who shot [the police officer] and they are not the ones who shot [him]."

misidentification in this context is tied in with the word "confrontation," which connotes "a calculated move by the police to bring about pre-trial observations of a suspect by an eyewitness." *Commonwealth* v. *D'Ambra,* 357 Mass. 260, 263 (1970). In the *D'Ambra* case we said that when an eyewitness accidentally confronts a suspect, and the police make no improper attempt to elicit an identification, the problem of illegality disappears. *Ibid.*

No evidence was brought out on examination of the witness Margulis that his observation of the defendant was prearranged in any way. The defendant accompanied the jury on the view at his own request. Thus, while it may be difficult to accept that an individual would make no identification of a suspect on the day of the crime, and would unhesitatingly do so on seeing that same suspect, handcuffed and surrounded by police officers, on a day eight months after the incident, the due process argument we consider here calls on us to weigh more than just the witness's credibility. Accepting the judge's findings on this issue as true, see *Commonwealth* v. *Murphy,* 362 Mass. 542, 547 (1972), we conclude that the trial judge was warranted in finding that Margulis spontaneously recognized the defendant at a chance encounter. See *Allen* v. *Moore,* 453 F.2d 970, 974 (1st Cir.), cert. denied, 406 U.S. 969 (1972).

What we have said regarding Margulis's out-of-court identification has direct bearing in this case on the correctness of the judge's ruling with respect to the in-court identification which followed within a matter of days after the out-of-court encounter.[12]

---

[12] The judge found that, all told, Margulis observed the murderer for several minutes, at one time face-to-face while the man held a gun to him and took a plastic case containing identification cards from him; at another time when, as close as one foot from him, the man struggled with and shot the police officer; and at still another time when the man returned to the body of the slain policeman and removed a gun and wallet. The judge accepted the witness's explanation that he did not identify any photographs and failed to identify the defendant at the lineup because of the effect of the incident on him, because his attention was minimal due to the trauma of the incident, and because the witness was scared and made but a cursory observation of the in-

9. The witness Anastasio Kapfaskis, an employee of the pawnshop at the time of the incident, testified that he had been shown numerous photographs of possible suspects on three occasions on the day of the murder, had identified one photograph (the defendant's) as that of the man who shot the police officer, and had viewed eleven men in a lineup held on the evening of the murder and identified the seventh man from the left (the defendant) as the one who shot the police officer. Kapfaskis was further allowed, over the objection and exception of the defendant, to make an in-court identification of the defendant as the murderer.

The defendant contends that this witness's testimony concerning his pre-trial identification of the defendant at the lineup should have been excluded because it was the product of an illegal arrest and was based on an invalid lineup which violated the defendant's right to due process of law. It is further alleged that the in-court identification proffered by the witness Kapfaskis should have been excluded because the trial judge made no finding regarding an independent basis for this identification or, in the alternative, the identification was tainted by the "illegal" lineup and should for this reason have been excluded.

In support of his argument regarding the witness's pre-trial identification, counsel for the defense brought out on voir dire of this witness that his identification at the lineup was equivocal, and that the officer conducting the lineup unsuccessfully pressed the witness for a more definite state-

dividuals in the lineup. It was ruled that the in-court identification was based solely and completely on the witness's observation of the defendant during the course of the robbery and murder.

Because we have upheld the judge's ruling that the pre-trial "confrontation" was not so suggestive as to violate due process, it is unnecessary for this court to enter into the special analysis (concerning "independent source") which is required in any case where it is shown that there was a prior illegal pre-trial identification procedure. We further express no comment as to the permissible applicability of an approach, different from the independent source rationale, to a confrontation and in-court identification which occurred after the decision in *Stovall* v. *Denno,* 388 U.S. 293 (1967). See *Commonwealth* v. *Botelho,* 369 Mass. 860, 870-875 (1976).

ment.[13] As to the in-court identification, the defendant cites as controlling the case of *Commonwealth* v. *Mendes*, 361 Mass. 507, 511 (1972), where we said that, in a case where there was an illegal pre-trial identification necessitating a new trial, the issue of independent basis for an in-court identification should be considered and resolved by the trial judge in explicit findings.

We find no merit in either of these allegations of error. The trial judge made specific findings, supported by the witness's testimony at trial and on voir dire, that there was nothing impermissibly suggestive about the photograph identifications or the lineup, at which the defendant was represented by counsel. The judge's findings amply support his conclusion. Rather than suggesting that any particular suspect in the lineup was indeed the one who shot the police officer, the officer conducting the lineup was pointing out that the witness should (in fairness, perhaps, to one who was not involved in the pawnshop incident) tell the police *if* he had seen any of the suspects before. We cannot, in all the circumstances, consider the officer's prodding an intimation that the police believed that one of the lineup participants was the assailant, or that Kapfaskis was identifying "the wrong man." The judge's failure to make explicit findings relating to the issue of independent basis is not error in this case, in light of his specific and well based finding that there was no suggestiveness in

---

[13] The following colloquy took place at the lineup, in the defendant's presence, after Kapfaskis had said that the one who shot the policeman was either number seven (the defendant) *or* number eleven from the left:

THE POLICE OFFICER: "Have you ever seen any of them before?"

THE WITNESS: "Yes."

THE POLICE OFFICER: "Which one?"

THE WITNESS: "Do I have to?"

THE POLICE OFFICER: "I feel it is your duty if you have seen them to tell us. We are no better than the witnesses we have. Like I said, which one?"

The witness continued to equivocate, maintaining that it was either number seven or number eleven from the left.

the photograph identifications or the lineup.[14] Conflicts in Kapfaskis's testimony before the grand jury regarding the assailant's footwear, as well as the full transaction of events at the lineup, were brought to the jury's attention and were correctly treated as matters going to the weight of the witness's identification as opposed to its admissibility.

10. At trial, the Commonwealth presented Anthony Irving as its own witness. On direct examination, Irving testified to a meeting prior to the robbery at which he asked the defendant "if he wanted to make any money." Irving then stated that "we decided [to] make some money, and we had a stolen car, but we didn't want to take the stolen car." After the prosecutor queried the witness as to who was meant by his reference to "we," the defendant objected; the judge permitted the witness to answer, "Me and [the defendant]," and the defendant excepted to the admission of this testimony. The defendant now contends that, since it is common knowledge that stealing or receiving a stolen automobile is a crime, this testimony was prejudicial, and that the trial judge's statements before the jury in ruling on his objection[15] compounded the prejudice.

It is generally not permissible to show that a criminal defendant committed an unrelated crime on a prior occasion if the purpose of this showing is to raise an inference of guilt on the charge faced by the defendant at trial. *Commonwealth* v. *Welcome,* 348 Mass. 68, 70-71 (1964).

---

[14] See note 12 *supra.* In any event, we think that, if detailed findings by the judge had been called for here, the evidence fully would have warranted a finding of independent basis for the in-court identification since the witness testified that he observed the assailant for "a good minute" before and during the shooting, and gave a good description of the clothing worn by the man he observed and the events which transpired after the shooting. See *United States* v. *Wade,* 388 U.S. 218, 241 (1967).

[15] In making his ruling the judge said: "Well, I don't know whether Walker had anything to do with this. You have to explore this. I think I will have to permit an explanation. He said, 'We had a stolen car.' Go ahead. What do you mean by 'we?' He said, 'we.'" After the witness's response the judge said: "I will let it stand for whatever it is worth."

*Commonwealth* v. *Banuchi*, 335 Mass. 649, 654 (1957), and cases cited. Nevertheless, this rule is not applicable in all situations where the question arises; rather, there may be other relevant and probative purposes on which to base admission of the testimony of unrelated crimes. We have stated the test to be applied in these instances in this way: "If . . . the value of the statement as legitimate proof appeared to be substantially outweighed by the danger of prejudice not correctable by the good sense of the jury, a case could be made for excluding it . . . ." *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 816 (1973).

It is not apparent from the record that the Commonwealth elicited this specific reference to a stolen car for any invalid purpose. Further, any prejudice to the defendant engendered by admission of this testimony was substantially outweighed by the probative value of the statement on the issue of criminal intent, see *Commonwealth* v. *Butynski*, 339 Mass. 151, 152 (1959), and the judge's instructions to the jury on the subject.

11. Detective McConkey testified before the jury that following the incident he had shown Lawrence Bean, a witness to the robbery and murder, a group of photographs, and that Bean had selected three or four photographs, one being a photograph of the defendant. The defendant contends that this testimony was inadmissible hearsay and severely prejudicial because it violated his right to confront the witnesses against him as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. *Bruton* v. *United States*, 391 U.S. 123, 126 (1968). *Pointer* v. *Texas*, 380 U.S. 400, 406 (1965).

We do not agree that the admission of this testimony required the allowance of the defendant's motion for a mistrial. The testimony was struck from the record by the judge and a definitive cautionary instruction was given to the jury at the first opportunity, followed by a questioning of the jurors regarding any influence or prejudice the statement may have created in their minds against the defendant. The witness Bean had previously taken the stand and had testified that he selected five or six photo-

graphs as "resembling" the men in the store on the day in question, but he also testified before the jury that he did not positively identify anyone at the lineup, and the clear implication of his total testimony was that he did not get a good look at the person who shot the police officer. Though the defendant argues persuasively that *Bruton* v. *United States, supra,* and *Jackson* v. *Denno,* 378 U.S. 368 (1964), authoritatively established that curative instructions, in certain circumstances, are insufficient to remedy the prejudice resulting from inadmissible but dramatic evidence which reaches the jurors' ears, we do not consider those decisions apposite in the circumstances of this case. We hold to our expressed belief that "it cannot be assumed that jurors will ignore strong instructions to disregard certain matters." *Commonwealth* v. *Stone,* 366 Mass. 506, 513 (1974), citing *Commonwealth* v. *Gordon,* 356 Mass. 598, 604 (1970).

12. The Commonwealth was permitted to read in evidence a portion of the transcript of Ms. Freeman's pretrial testimony after the defendant had purportedly impeached Ms. Freeman at trial through use of another portion of the same transcript of testimony. The defendant claims that his use of the pre-trial testimony was to show a prior inconsistent statement by Ms. Freeman relating to whether she had seen a gun or guns before the police found two guns in one of the bedrooms, and that the Commonwealth could not corroborate Ms. Freeman's trial statement or use the pre-trial testimony to show a prior consistent statement that the witness made. See *Commonwealth* v. *Heffernan,* 350 Mass. 48, 52 (1966); *Boutillette* v. *Robbins,* 338 Mass. 195, 197-198 (1958); *Wilson* v. *Jeffrey,* 328 Mass. 192, 194 (1951).

The defendant's statement of the rule of evidence regarding prior consistent statements, in the abstract, is correct. However, we find no error in the trial judge's ruling allowing the Commonwealth to read the disputed portion of the transcript since it is plain that this ruling was predicated on a desire to keep the witness's entire testimony in context. From a reading of the entire testimony of this

witness it is readily seen that the specified few responses in her pre-trial testimony, to which the defendant referred, were not inconsistent with her trial testimony that she saw the defendant with a gun before the police entered her apartment. All that the defense succeeded in bringing out at the pre-trial hearing was that Ms. Freeman had not actually seen any guns in the bedroom where they were eventually discovered by the police.

13. Nathaniel Williams, an accomplice of the defendant in the robbery, refused to answer questions (other than preliminary questions) at the pre-trial hearing on the motion to suppress, claiming his privilege under the Fifth Amendment to the United States Constitution. He testified at trial, however, giving a thorough description of the events of November 30, 1973, and inculpating the defendant as to the robbery and the murder. On cross-examination, certain questions propounded by the defendant bearing on Williams's motivation for testifying were excluded by the judge, and it was further ruled that the defendant could not pursue before the jury a line of questioning going to whether Williams had refused to testify at the pre-trial hearing.

The issues raised by the allegation that these evidentiary rulings were in error are whether the judge unduly limited the defendant's rights to cross-examine and confront the witnesses against him, and whether the judge erred in denying the defendant his right to impeach by showing bias or motivation for Williams's testimony.[16]

---

[16] A related assignment of error concerns the trial judge's exclusion of a question put to Ms. Freeman which sought to show that she might be motivated to shift blame for the murder because her fiancé, Arnold Walker, was under indictment as an accessory after the fact to murder stemming from the pawnshop incident. Notwithstanding the fact that this question was not answered, the defendant brought out quite clearly the relationship between Ms. Freeman and Arnold Walker, and further showed that Ms. Freeman had no particular affection for the defendant. We cannot say that the trial judge abused his broad discretion to make proper rulings on the scope of cross-examination in this instance. See, e.g., *Commonwealth* v. *Heffernan,* 350 Mass. 48, 50, and cases cited, cert. denied, 384 U.S. 960 (1966).

Without derogating from the importance to a fair trial
of the right of cross-examination, see *Commonwealth* v.
*Ahearn, ante,* 283, 286-287 (1976); *Commonwealth* v. *Fer-
rara,* 368 Mass. 182, 186-190 (1975); *Davis* v. *Alaska,* 415
U.S. 308, 315-318, 320 (1974); *Chambers* v. *Mississippi,*
410 U.S. 284, 294-295 (1973), the courts of this Common-
wealth have recognized that this right is not necessarily
infringed by curbing inquiry where the matters sought to
be elicited have been sufficiently brought to the attention
of the trier of fact through other questioning or other
means. See *Commonwealth* v. *Carroll,* 360 Mass. 580, 589
(1971); *Commonwealth* v. *Dominico,* 1 Mass. App. Ct.
693, 712-714 (1974). In the instant case there was ample
evidence, including the recounting of a stipulation between
the prosecutor and Williams's attorney that if Williams
testified the court would be asked to accept a plea of guilty
of murder in the second degree, which the jury could weigh
against the witness's assertion on the stand that he was
motivated only to tell the truth. As for the defendant's
contention that he was severely prejudiced by not being
permitted to bring out that Williams had refused to testify
earlier, we think the trial judge was well advised to rule as
he did in this case, and there was no abuse of discretion in
this ruling. See *Commonwealth* v. *Heffernan,* 350 Mass. 48,
50, and cases cited, cert. denied, 384 U.S. 960 (1966).

14. The defendant requested that the following question
be directed to prospective jurors: "This case will involve
testimony by both police officers and private citizens, and
such testimony may be in conflict. Will you tend to give
greater weight or belief to the testimony of a police officer,
simply because he is a police officer?" Although the Com-
monwealth had no objection to allowing this question, it
was within the sound discretion of the judge to deny the
request. *Commonwealth* v. *Pinckney,* 365 Mass. 70, 73
(1974). *Commonwealth* v. *Stewart,* 359 Mass. 671, 677
(1971) (no abuse of discretion in refusing similar ques-
tions even though defendant on trial for killing a police-
man). The defendant's argument that refusal to put this
question to prospective jurors abridged his right to a fair

and impartial jury by preventing effective voir dire examination is groundless. G. L. c. 234, § 28, as amended by St. 1973, c. 919.[17] *Commonwealth* v. *Pinckney, supra,* and cases cited. The same can be said for the defendant's further argument that the judge erroneously refused to allow defense counsel personally to ask voir dire questions of the prospective jurors. See *Commonwealth* v. *Nassar,* 354 Mass. 249, 253 (1968), cert. denied, 393 U.S. 1039 (1969); *Commonwealth* v. *Kiernan,* 348 Mass. 29, 35-36 (1964); *Commonwealth* v. *Geagan,* 339 Mass. 487, 504, cert. denied, 361 U.S. 895 (1959), petition for habeas corpus denied sub nom. *Geagan* v. *Gavin,* 181 F.Supp. 466, 474 (D. Mass. 1960), aff'd, 292 F.2d 244, 248 (1st Cir. 1961), cert. denied, 370 U.S. 903 (1962).

15. The defendant moved before trial that he be allowed to sit at the counsel table rather than in the prisoner's dock, as is customary in Massachusetts in criminal trials, absent unusual circumstances. We have in other cases considered the same basic arguments as those presented on these appeals, i.e., that use of the dock deprives an accused of his presumption of innocence before the jury and his right to consult freely with counsel during the trial, and prejudices him with respect to in-court identification by witnesses. In those cases we have said that "it is within the sound discretion of the trial judge whether to grant a defendant's request to sit at counsel's table or elsewhere." *Commonwealth* v. *Bumpus,* 362 Mass. 672, 680 (1972), citing *Commonwealth* v. *Jones,* 362 Mass. 497, 500-501 (1972).[18] In the present case the judge assured counsel for

---

[17] The trial of this case took place before G. L. c. 234, § 28, was amended by St. 1975, c. 335, which, "if it appears that, as a result of the impact of considerations which may cause a decision . . . to be made in whole or in part upon issues extraneous to the case," makes mandatory inquiry into matters such as "possible preconceived opinions toward the credibility of certain classes of persons."

[18] Since the *Bumpus* decision, in *Commonwealth* v. *Brown,* 364 Mass. 471, 479-480 (1973), we established certain minimal guidelines which we suggested a trial judge follow when he contemplates using excessive or special security precautions at a trial. The *Brown* requirements were geared to deal with special restraints or precautions, such as shackling,

the defendant that he would have all the time he needed to confer with his client during the trial. Despite the fact that two identifying witnesses made reference to the man in the dock as the one who shot the police officer, other crucial identification testimony came from accomplices to the crime who, presumably, would have been able to identify the defendant regardless of where he was seated in the court room. We do not think that the judge abused his discretion by arbitrary or unreasonable action, considering the crimes charged and the defendant's reputation.

16. The defendant cites as erroneous the judge's instruction to the jury that the Commonwealth, unlike the defendant, cannot appeal the jury's decision. Claiming that there was no necessity for injecting into the proceedings the "extraneous and prejudicial" issue of appeal rights, the defendant cites decisions from other jurisdictions in which reference to the appeals process was held to be reversible error. See *United States* v. *Fiorito,* 300 F.2d 424, 426-427 (7th Cir. 1962). *State* v. *Mount,* 30 N.J. 195, 212-215 (1959). Cf. *People* v. *Johnson,* 284 N.Y. 182, 187-188 (1940) (prosecutor's questions to prospective jurors). An examination of the cited decisions uncovers the rationale behind such holdings: It is reversible error for the judge or prosecutor to make remarks which have the inescapable effect of reducing the jurors' appreciation of the significance of their deliberations and verdict. Such remarks implicitly tell the jurors not to be overly concerned about rendering hasty or "correct" verdicts, since the defendant is adequately protected by the process of appeal to higher tribunals.

The defendant has indeed touched on a subject which, if it is to be mentioned to the jury at all, must be handled with the greatest of care and discretion by a judge in framing his jury instructions. We can conceive of trials in which the better practice might be to refrain from mentioning

handcuffing or gagging a defendant, and were not intended to deal with less drastic means of minimizing the danger of harm to the public and maintaining order in the court room, such as use of the prisoner's dock.

anything about the Commonwealth's part in the appellate process. Where it appears to the trial judge that the defendant could not have been placed in an unfavorable light through the routine practice of his counsel in objecting and excepting, again it may be preferable to forgo comment. In our time it is probable that jurors are aware of appeals in criminal cases, and unless the trial judge has some reasonable belief that procedures employed during the trial may have unduly confused the jury or unduly prejudiced one side or the other — with an especially keen eye to any possible unfairness to the defendant — it is better to allow their awareness to play what small part it will, if any, in the decision they reach.

Having said this, we find no error in the instruction before us.[19] Taken as a whole, this portion of the judge's

---

[19] The pertinent part of the challenged instruction is as follows: "Now, during the course of the trial you probably observed undoubtedly that certain objections were taken by the defendant through his attorney. Well, the law in that regard is that the defendant, if he fails to save an exception or take an exception to a judge's ruling, has nothing as a basis for a review in a higher tribunal, so in order to protect the rights of the defendant, it is incumbent upon his attorney to take an exception to any ruling that the Court might make in order to perfect or open the door for an appeal, if one indeed is taken, and it is only for the purpose of later determining of the legality of the rulings made by the judge if exceptions are taken and if an appeal is taken. This is the right of the defendant, defendant's counsel. This is the reason why exceptions were taken by the defendant doing his job for his client, or by the defendant's counsel doing his job for his client.

"Now, on the other hand, you probably noted that certain objections were made by the Assistant District Attorney but that no exceptions were taken by the Assistant District Attorney. Well, under our procedure and the state of our law a District Attorney or Assistant District Attorney may make objections and call matters to the attention of the Court and have discussions with the Court at the other end of the bench, as you saw we did on many occasions, but the Commonwealth has no right to an appeal except in certain preliminary matters with which you are not now concerned. So, if the judge overrules an objection of the Commonwealth so far as the Commonwealth is concerned, the Assistant District Attorney again may call a particular ruling of law to the Court for correction, suggest correction to the Court, but he cannot take a legal exception. I wanted to point out to you why you might have seen exceptions on the part of the defense counsel, no exceptions on the part of the Assistant District Attorney trying the case for the Commonwealth."

instruction was plainly designed to protect the defendant from prejudice by explaining his counsel's unquestionably proper actions in preserving his client's rights.

17. The witness Susan Reyno was not permitted to make an in-court identification of the defendant because the judge, after voir dire, found that the prosecutor or someone designated by him had shown her a suggestive photographic display just prior to her testimony at the trial. She had seen numerous photographs of possible suspects shortly after the incident and had viewed the lineup held that evening but had not positively identified the defendant on either occasion. However, the Commonwealth did elicit from the witness that she saw and could identify the two men who did not shoot the police officer, and that these two men were not in the court room. The defendant assigns the denial of his motion for a mistrial as error, alleging that the judge permitted the jury, through this procedure, to infer that the witness had made an identification of the defendant. It is further said that the defendant was placed in a quandary through this procedure since he could not cross-examine Mrs. Reyno to show her inability to identify the defendant without exposing the jury to her prior illegal identification.

The judge's ruling, which precluded the in-court identification of the defendant by this witness, did not extend to any testimony she offered regarding the other two men she observed in the store on the day of the crimes. While the record is somewhat muddled on this precise point, it appears that the witness had testified previously that she could identify two "fellows" who, from their locations in the pawnshop at the moment of the shooting, could not have killed the police officer. This testimony was received before the jury without objection. There was no motion to strike this testimony at any point during the witness's examination. The effect of Mrs. Reyno's later testimony was cumulative at worst, see generally *Commonwealth* v. *Kirker*, 362 Mass. 202, 203-205 (1972), and its admission does not supply grounds for a mistrial.

The defendant's dilemma, referred to *supra*, was more imagined than real. The record shows that the defendant on cross-examination successfully procured an admission from the witness that she had lied to the defendant's investigator about the number of persons involved in the robbery whom she could identify, and the jury were read the lineup transcript where, confronted with the defendant, Mrs. Reyno could not identify him and said, "No, he was taller, I think." The judge excluded further questions by the prosecutor on redirect examination which would have emphasized that Mrs. Reyno had said, prior to or during the voir dire, that she could identify all three men who were in the store. The judge also refused to allow the prosecutor to use before the jury any photographs of the two other men on the basis that they were not supplied to the defendant pursuant to a court order. There was no substantial prejudice to the defendant in these circumstances.

18. The defendant produced at trial two lay and two expert witnesses who testified, inter alia, to the defendant's bizarre behavior since early childhood, attempts to place the defendant in McLean Hospital in early 1972, and the defendant's insanity within the meaning of *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547, 555 (1967). The Commonwealth produced no expert witnesses to rebut this testimony. More will be said of the specifics of the expert testimony *infra;* for now it is sufficient to note that this evidence properly raised an issue for the jury to resolve.[20]

---

[20] The defendant does not assert that, as matter of law, he should have been granted directed verdicts of not guilty by reason of insanity. This undoubtedly stems from our ruling in *Commonwealth* v. *Smith,* 357 Mass. 168, 177-180 (1970), where we said that it was not error to deny a motion for a directed verdict in the context of a case in which the Commonwealth presented no evidence that the defendant was sane and the defendant presented two experts who concluded that the defendant was insane at the time of the commission of the offense. See *Commonwealth* v. *Kostka, ante,* 516, 535-536 (1976); *Commonwealth* v. *Ricard,* 355 Mass. 509, 515 (1969); *Commonwealth* v. *Hartford,* 346 Mass. 482, 489 (1963); *Commonwealth* v. *Cox,* 327 Mass. 609, 613 (1951). In the *Smith* case we emphasized that the question of criminal responsibility "is one of the issues of fact which in a capital

The defendant argues that there was error in this case in the judge's instruction to the jury on sanity. The defendant would have this court (1) reverse his convictions on all the indictments because the judge's instruction reversed the burden of proof[21] and in effect allowed the Commonwealth to prove its case by presenting no evidence whatsoever on the issue of sanity, or (2) set aside the verdicts of guilty on all the indictments as against the weight of the evidence since the defendant presented lay and expert testimony as to his legal mental incapacity to commit the crimes charged and the Commonwealth presented no affirmative evidence of sanity, relying instead on the "presumption of sanity."[22]

The trial judge instructed the jury that, "[g]enerally, when a person is charged with a criminal offense and there is no evidence introduced concerning his mental condition, under such circumstances it is to be presumed that the person charged with the crime was of sufficient mental capacity to commit it. We assume under those circumstances, as I just recently indicated, that the man has the mental capacity to commit a crime. The law states that in such cases there is a presumption that a person is sane." He continued to instruct that the jury must "consider and look at the whole evidence regarding the mental condition of the defendant in making [the] determination [of sanity or

case must 'be tried by a jury,' " and we were emphatic in holding that the power of the jury as sole judges of the credibility and weight of all the evidence of sanity could not be usurped by expert opinion testimony. *Commonwealth* v. *Smith, supra* at 178, 180.

[21] The burden of proof is a composite burden usually requiring the party on whom it rests to "go forward" with the evidence (the "burden of production") and to convince the trier of fact by some quantum of evidence (the "burden of persuasion"). The defendant concedes that, even in a criminal case, where insanity is a defense the defendant shoulders the "burden of production," and therefore no challenge to the judge's instruction in this case is premised on a shifting of this burden. The defendant's challenge to the instruction is concerned only with the manner in which, from his viewpoint, it shifted to him the "burden of persuasion."

[22] See *Commonwealth* v. *Kostka, supra* at 525 n.5, wherein we explained the necessity of using the term "presumption," and indicated that we do not suggest that the term be used in instructing the jury.

insanity]," and that "[t]he burden is upon the Commonwealth to prove that the defendant was legally sane beyond a reasonable doubt[23] . . . as I have already defined for you the meaning of proof beyond a reasonable doubt."

The judge then pointed out to the jury that "we have had some opinion testimony given by psychiatrists, psychologist, and we have heard other evidence as to the mental capacity of the defendant for his acts or conduct." After explaining that those who have "given special attention and study to the field of mental infirmities and weaknesses [are] allowed to give [their] opinion as to the mental capacity of a defendant to commit a crime," the judge charged that because experts are allowed to express their opinions, "it doesn't follow that [they] are to usurp the function or to stand in the place of the jury." Experts' opinions, the judge noted, are "evidence for your consideration," and "subject to the weight that the jury feels should be given to it."

The judge then told the jury that "[i]n assessing a defendant's mental responsibility for crime, the jury should weigh the fact that a great majority of men are sane and the probability that any particular man is sane." The assessment of mental responsibility for crime, the judge said, "is to be made in each case in the light of the evidence introduced, the circumstances that [the jury] have heard." As "sole judges of the credibility and weight of all evidence on the issue of insanity," the jury "may believe, but is not compelled to believe, any . . . testimony or opinion given by an expert."

---

[23] The defendant flags as confusing and incorrect the judge's reference at one point in his charge to the Commonwealth's burden of proving the defendant "*reasonably* sane beyond a reasonable doubt." Beyond question, this was an unfortunate slip of the tongue. However, coming as it did — sandwiched between repeated references to the correct standard of "legally sane beyond a reasonable doubt" — we will not engage in a "fine-spun parsing of the . . . judge's charge to the jury [so as to turn] the appellate review of this case into [a] 'quest for error' . . . ." *Cool* v. *United States,* 409 U.S. 100, 105 (1972) (Rehnquist, J., joined by Burger, C.J., and Blackmun, J., dissenting). See *Cupp* v. *Naughten,* 414 U.S. 141, 146-147 (1973).

The judge then reiterated that "it has been stated in our judicial decisions that it is for the jury to determine whether or not the fact that a great majority of men are sane and the probability that any particular man is sane may be deemed to outweigh the evidential value of any expert testimony that [a person] is insane." In concluding this portion of his charge, the judge stated that "[i]t is for the jury to determine again on all the evidence and all of the circumstances whether the defendant did or did not lack mental capacity to commit a crime."

We find no reversible error in this charge to the jury. Contrary to the defendant's assertion, the judge did not instruct the jury that they could weigh the "presumption of sanity" as an element of the whole evidence and then determine that the "presumption" outweighed the evidence of lay and expert witnesses that the defendant was insane at the time of the crimes. The judge's reference to the fact that in the mine run of cases (where no evidence is presented by either side on the issue of sanity) a person is "presumed" sane, though we do not see its relevance in this case, was merely introductory. This language set the stage for the judge's more pertinent instructions as to the law in cases where the defendant does produce evidence of insanity. In the latter, more crucial portion of his charge the judge instructed, not as to any "presumption of sanity," but only as to the jury's prerogative of considering the "fact that a great majority of men are sane and the probability that any particular man is sane."[24]

In so instructing the jury, the judge correctly distinguished between the procedural and substantive operations of the "presumption of sanity" which we recently analyzed in *Commonwealth* v. *Kostka, supra* at 530-531. The substantive operation of the "presumption," we said in *Kostka*, does not require or allow the jury to weigh the "presumption" itself as evidence; "rather, the jury weigh

[24] See *Commonwealth* v. *Kostka, supra* at 525 n.5 (1976) wherein we described the appropriate charge to be given as to this aspect of the proof of sanity.

the facts underlying the presumption and the inferences that may follow from those facts ... which are considered to be part of the jury's 'common experience that most people ... are sane' " (citations omitted). *Commonwealth* v. *Kostka, supra* at 530-531.

Nor are we compelled to conclude that the judge's instruction here permitted the jury to find the defendant sane beyond a reasonable doubt based solely on their common experience that most men are sane. As we have recognized in several decisions (see note 20 *supra*), most notably *Commonwealth* v. *Smith,* 357 Mass. at 180-181, whether or not a defendant testifies or makes an unsworn statement, there is invariably other evidence which a jury are permitted to weigh in reaching their conclusion on the sanity issue. See *Commonwealth* v. *Ricard,* 355 Mass. at 515 (evidence of provocation and of defendant's conduct before and after the crime); *Commonwealth* v. *Hartford,* 346 Mass. at 489-490 (testimony of witnesses as to defendant's conduct around the time of the crime); *Commonwealth* v. *Cox,* 327 Mass. at 613 (evidence of murder committed with deliberately premeditated malice aforethought). In the instant case there was accomplice testimony relating to the defendant's conduct before the crimes, eyewitness testimony relating to the defendant's conduct at the time of the murder, and testimony from others who were able to observe the defendant a short time after the crimes had been committed. In addition, the circumstances of the murder in this case could not have made it "plainly apparent" that no sane person would have committed the act. *Commonwealth* v. *Smith, supra* at 180. See *Commonwealth* v. *Francis,* 355 Mass. 108, 111 (1969); *id.* at 112 (Whittemore and Cutter, JJ., dissenting). The charge to the jury clearly and correctly pointed out that their duty was to consider *all* the evidence in reaching their decision on the defendant's mental responsibility.

Finally, we are not persuaded that the judge's instruction impermissibly shifted the burden of proof to the defendant. The instruction was emphatic as to the Com-

monwealth's burden of proving sanity beyond a reasonable doubt;[25] it left no room for the jury to maneuver in determining whether that burden had been met on all the evidence. As we said in *Commonwealth* v. *Kostka, supra* at 533, since sanity is not an element of the crimes charged, "recent Supreme Court cases on the use of presumptions and inferences to establish an element of the offense . . . [and thus shift the burden of proof as to those elements to the defendant, are not] apposite to our inquiry."[26]

19. *Disposition under G. L. c. 278, § 33E.*

With particular reference to the defendant's urging that we set aside the verdicts of guilty as against the weight of the evidence because the Commonwealth presented no expert testimony that the defendant was sane at the time of the crimes, our observations in the *Kostka* case are pertinent. As we said there, "We believe that the instant case can be distinguished readily from the cases in which we have determined that the defendant's evidence of insanity was so compelling that reversal under § 33E was appropriate." *Commonwealth* v. *Kostka, supra* at 537-538.

We have alluded to the testimony in this case bearing on the circumstances of the crimes which the jury could properly consider as relevant to the dual tests of sanity as set forth in *Commonwealth* v. *McHoul,* 352 Mass, 544, 546 (1967). There was testimony from one of the defendant's accomplices that he and the defendant planned the pawnshop robbery "to make some money," and that they enlisted as the driver of the getaway car a third person who had a car bearing out-of-State license plates; the witnesses to the murder testified that the defendant shot the police-

---

[25] In this regard the instruction was in conformity with the standard long enunciated by this court in the many cases cited and discussed in *Commonwealth* v. *Kostka, supra.*

[26] In this quote from *Kostka* we cited *Barnes* v. *United States,* 412 U.S. 837 (1973), and *Turner* v. *United States,* 396 U.S. 398 (1970), cases relied on by the defendant in the present case as supportive of his claim that the instruction impermissibly shifted the burden of proof to him.

man during a struggle, and then returned to the slain officer's body to remove his wallet and service revolver; Ms. Freeman and Anthony Dobson, who were present in the Freeman apartment after the robbery and murder, testified as to the events surrounding the "splitting up" of the robbery proceeds; Ms. Freeman testified as to the defendant's reaction on learning that the police had surrounded her apartment; and, finally, two of the police officers present at the Freeman apartment testified that the defendant denied that he was Terrell Walker when asked his identity. From this testimony a basis could be found to differentiate between the instant case and cases like *Commonwealth* v. *Mutina*, 366 Mass. 810 (1975), and *Commonwealth* v. *Cox*, 327 Mass. 609 (1951), where, as we pointed out in *Kostka*, *supra* at 538, "there was neither an intelligent plan nor a rational motive for the murder."

Furthermore, though this case differs even from *Kostka* in that two qualified experts (as compared to one such expert in the *Kostka* case) expressed the opinion that the defendant was insane at the time of the crimes, we cannot say that the jury would not have been justified in according little weight to both of the experts' opinions. In particular, the opinion of the first of the two experts (Dr. Gatti) was susceptible to receiving slight value since he had seen the defendant only once for approximately an hour and a half some one and one-half years before the pawnshop incident and, admittedly, he had no knowledge of anything that might have happened to the defendant in the interval between his interview with the defendant and the commission of the offenses.

We have examined the entire record and given careful consideration to all the defendant's assertions in view of our duty under G. L. c. 278, § 33E, and a majority of the court are of the opinion that justice does not require reversal, a new trial, or the entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*

HENNESSEY, C.J. (dissenting in part, with whom Kaplan, J., joins). As in the recent case of *Commonwealth* v. *Kostka, ante,* 516 (1976), I am impelled to utilize the unusual procedure of writing the main opinion for the court and including in this separate opinion my dissent from the court's reasoning in declining to set aside the verdict in this case under § 33E.

Once again we are faced on appeal with a case in which there was uncontradicted expert testimony that the defendant — who had a long history of mental disease antedating the crime — was insane at the time he committed the offenses with which he was charged. In my opinion, not only is the fact that the Commonwealth has chosen not to produce affirmative evidence of sanity "inexplicable" (see *People* v. *Silver,* 33 N.Y.2d 475, 483 [1974]), but it results, in this case, in injustice of the kind this court may prevent by exercising our discretion under § 33E.

In the majority's refusal to act under § 33E here, I discern a trend toward treating the Commonwealth's burden on the sanity issue in cases like *Commonwealth* v. *Mutina,* 366 Mass. 810 (1975), and *Commonwealth* v. *Cox,* 327 Mass. 609 (1951), differently from its burden in cases such as this one and *Commonwealth* v. *Kostka, supra.* There may be some validity to this trend; but the problem remains as to just what role the "presumption of sanity" should play in these cases. I suggest that a more uniform approach by this court would place the Commonwealth on notice that the failure to introduce medical evidence of sanity, in the face of credible evidence tending to establish insanity, means that the Commonwealth "runs the very real risk of reversal and the granting of a new trial" under the provisions of § 33E. *Commonwealth* v. *Kostka, supra* at 539-540, (Hennessey, C.J., and Kaplan, J., dissenting in part).

LIACOS, J. (concurring). I am in general agreement with the majority's reasoning and agree with their result in this case. I share, however, the Chief Justice's concern about the proper role of the "presumption of sanity" after credible evidence of insanity has been adduced. I therefore

join in that part of his dissenting opinion which suggests that reversal and the granting of a new trial may be appropriate should the Commonwealth fail to produce affirmative evidence of sanity in a case such as this.